## UNION SULPHUR CO. v. TEXAS GULF SULPHUR CO. et al.

### No. 7594.

Court of Civil Appeals of Texas. Austin.

July 15, 1931.

Rehearing Denied Sept. 23, 1931.

Cullen R. Liskow, of Lake Charles, La., Proctor, Vandenberge, Crain & Vandenberge, of Victoria, Ingram & Munson, of Wharton, Vinson, Elkins, Sweeton & Weems, of Houston, and Black & Graves, of Austin, for appellant.

P. O. Settle, Claude McCaleb, and W. H. Wilson, all of Houston, Jno. M. Corbett, of Bay City, Jno. E. Green, Jr., of Houston, Williams, Neethe & Williams, of Galveston, Orgain, Carroll & Bell, of Beaumont, H. L. Stone, of Pittsburgh, Pa., and R. L. Batts, of Austin, for appellee.

McCLENDON, C. J.

Appellant, plaintiff below (called herein Union Company), sued Texas Gulf Sulphur Company (called herein Gulf Company), Gulf Production Company (called herein Production Company), and others to recover one-fourth undivided interest in the sulphur deposits in a 480-acre tract of land in Wharton county, and, in the alternative, for damages for failure to reasonably develop the mining of the sulphur on said tract under a mineral lease, referred to herein as the Weed lease. The right to recover the mineral title was predicated upon extinguishment by limitation of appellees' title acquired under the lease for failure to produce sulphur after its discovery, and upon abandonment.

At the conclusion of plaintiff's testimony, defendants moved for an instructed verdict, and the trial judge announced as his opinion that the Weed lease was still in force, but that he was uncertain whether the issue of damages should be submitted to the jury; whereupon plaintiff announced that it did not desire to have the issue of damages submitted to the jury. The court thereupon rendered judgment for defendants upon a directed verdict; from which judgment plaintiff has appealed.

The appeal presents three questions:

(1) Whether there was evidence, either conclusive as a matter of law, or prima facie, so as to support a fact finding, that the lease had terminated by limitation.

(2) Whether there was any evidence of abandonment.

(3) Whether the judgment constitutes a bar to any rights appellant might have under the lease.

The first question involves a proper construction of the Weed lease, which bore date June 29, 1922, was upon the expressed consideration of $240 cash and the covenants and agreements thereinafter contained, and granted the premises to the lessee "for the sole and only purpose of mining and operating for oil and gas, or other minerals, or of laying pipe lines and of building tanks, power stations and structures thereon, to produce, save and take care of said product."

It provided for one-eighth royalty of all oil produced and saved from the leased premises, and that "if sulphur is produced lessee shall pay 80 cts. per long ton royalty." This is the only specific reference to sulphur in the lease.

The two following clauses, the first providing for a 5-year exploratory period, and the second for its indefinite extension, are the main provisions around which the controversy

revolves. For convenience we will refer to these clauses, respectively, as Nos. 1 and 2:

(1) "It is agreed that this lease shall remain in force for a term of five years from this date, and as long thereafter as oil or gas, or other minerals or either of them, is produced from said land by the lessee. The term of this lease may be extended under last paragraph written herein."

The paragraph referred to reads: (2) "If an oil well is actually drilling on these premises at the end of the five-year period, this lease shall remain in force as long as lessee continues drilling operations on said well, or any successive well, with due diligence and good faith in an effort to develop oil or gas or other minerals; provided not more than 90 days shall elapse after abandonment of one well before commencing another well, and if oil or gas or other minerals shall be discovered this lease shall remain in force as long thereafter as lessee continues to produce any one of said minerals."

The following additional provisions should be noted:

"If no well be commenced on said land on or before the 29th day of June, 1923, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor or to the lessor's credit in the Bank of Hardin, at Hardin, Mo., or its successors, which shall continue as the depository, regardless of changes in the ownership of said land, the sum of fifty cents per acre, which shall operate as a rental and cover the privilege of deferring the commencement of a well for six months from said date. In like manner and upon like payments or tenders, the commencement of a well may be further deferred for like periods of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privilege granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred.

"Should the first well drilled on the above described land be a dry hole, then, and in that event, if a second well is not commenced on said land within twelve months from the expiration of the last rental period for which rental has been paid, this lease shall terminate as to both parties, unless the lessee on or before the expiration of said twelve months shall resume the payment of rentals in the same amount and in the same manner as hereinbefore provided."

The first contention of appellant may be stated as follows:

(a) Under proper interpretation of the limitation set forth in the lease, the discovery of any one of the minerals covered by the lease in paying quantities during the five-year exploratory period (clause 1) would terminate the lease by limitation, unless at the end of the five-year period said mineral or some other mineral covered by the lease was then being actually produced. The evidence showed either conclusively or as a fact issue that sulphur was discovered in paying quantities during the five-year period, and no sulphur or any other mineral was being produced on the 29th day of June, 1927. Therefore either the lease terminated by limitation, or a fact issue in that regard was presented.

(b) Even if the lease were extended (clause 2) by actual drilling on June 29, 1927, the fact that sulphur was thereafter found in said well in commercial quantities and was not thereupon or within a reasonable time produced, the lease terminated by limitation.

The facts upon which these contentions rest are without material dispute, and may be summarized as follows:

Shortly after the lease was executed, the interest of the lessee passed to the Production Company, which company complied with all the provisions of the lease both as to drilling and payment of rentals during the entire five-year period. Two oil wells were drilled prior to March, 1927, neither of which showed any evidence of oil, gas, sulphur, or other mineral. Well No. 3 was begun March 10th, and completed or abandoned March 29, 1927. It showed no indication of oil or gas, but at 671 feet a deposit of sulphur and lime was topped which was drilled into for 36 feet, when there was a cave-in and the well was abandoned. Cores of this deposit were taken and sent to the Houston office of Production Company. Well No. 4 was begun April 6th, and completed June 7, 1927. It showed a sulphur bearing limestone deposit of 122 feet. These two wells, it will be noted, were completed prior to June 29, 1927, the termination of the five-year period, and both showed sulphur bearing deposits. Well No. 5, 250 feet from well No. 4, was begun June 19, 1927, was being drilled when the five-year period ended, and was completed August 22, 1927. Sulphur was topped at 746 feet, and further drilling showed sulphur and lime deposit of 67 feet and sulphur and gyp of 101 feet. There was no indication of oil, gas, or any mineral other than sulphur in any of these wells. The latter part of September, 1927, a well, presumably No. 6, was brought in as an oil producer, and oil in commercial quantities has been produced from the leased premises ever since.

After the discovery of sulphur in well No. 3, there were negotiations between the Production Company and appellant looking to a transfer by the former to the latter of the sulphur interests in the lease. These negotiations fell through, and on June 16, 1927, the Production Company transferred

said interest to the Gulf Company. From that time on there has been continuous drilling by both of said companies looking toward a development of the minerals in the land. Sulphur was not actually produced from the land until March 20, 1929, at which time the Gulf Company had erected and in operation a large sulphur mining plant. This suit was filed March 24, 1928.

Appellant relies upon the testimony of Keever, its vice president, to establish its assertion that sulphur in commercial quantities was discovered in both Nos. 3 and 4 wells during the five-year period, and in well No. 5 after the five-year period. We give the following as a fair summary of his pertinent testimony:

The only method of mining sulphur in deposits of this character is by what is known as the Frasch method; the process being to heat the sulphur to the point of liquification (245 to 248 degrees Fahrenheit) by forcing steam into the deposit, after which it is extracted in its then liquid state. The process is quite complicated, and requires a large and expensive plant, besides extensive preparation in the way of providing adequate water supply and transportation facilities. Keever gave as the lowest cost estimate of such plant $50,000, and as the shortest time for erection 90 days. He detailed quite at length the varied experiences in sulphur mining of appellant both in Texas and Louisiana, from which it appeared that the only certain method of determining whether sulphur existed in paying quantities was by erecting a plant and putting it in operation. The upshot of his testimony in this regard was that very favorable drill showings had proved unprofitable in some instances, and vice versa. In other words, it was always a gamble until demonstrated by the actual operation of a sulphur plant. His testimony further showed that, under prudent prospecting and where time therefor was afforded, a number of wells should be drilled to test out the extent of the deposit before incurring the expense of erecting a plant. Instances where appellant had drilled a large number of test wells, after sulphur was discovered and before erecting a plant, were given.

With reference to the core showings from wells 3 and 4, he testified: "Based upon my experience in the development of sulphur at Sulphur Mine, Louisiana, for the Union Sulphur Company, my opinion as to the presence of sulphur in the Chase & Hughes tract on the Boling Dome, from the logs and cores shown me, was that it showed there was plenty of sulphur; and it showed sulphur to be present on the Chase & Hughes tract on the Boling Dome in commercial quantities."

The following is from his cross-examination: "Q. Well, I will ask you then, Mr. Keever, in your judgment as an experienced sulphur operator, are you prepared to say that

it wouldn't be good sound business judgment, before going in and operating on a 480-acre lease, the size of the Chase & Hughes lease, involved in this litigation, to engage in a development program, with a view of developing whether or not the sulphur lay under that tract, or a large part of the tract, instead of just in two wells? A. Under the circumstances, I think a plant would have been justifiable for the production of sulphur. It might have been a policy, if you had time, to drill another well or two before the construction of the plant. If I had the Chase & Hughes lease to operate and had a showing from the two wells that I have spoken about in my direct testimony, in determining the size and kind of a plant, the location of a plant, with reference to the 480 acres of land contained in this lease, I don't think it would have been of much advantage to me, as an operator, to know whether the sulphur extended over the entire 480 acres, or only a portion of it, as I would have built the plant anyhow, from the showing that those wells have made; the reason that I would do that is that there have been several wells that we have produced sulphur from, that we have produced considerably over 100,000 tons of sulphur, which would justify the expense to demonstrate or determine whether there was sulphur there or not; if there was and it was necessary, there could have been additional plants built, in the meantime, for the further production of sulphur. It is my position that I would have built a plant on those two wells to demonstrate whether or not there was sulphur there in commercial and paying quantities, and that's the reason that I would have done it—because there was sulphur there showing in large quantities—and the only basis for it. That was the only way, as I see it, that it could be demonstrated whether or not it was there in commercial and paying quantities, because I have drilled wells that didn't show anything to speak of; we laid by for six and eight months because they didn't show enough sulphur, that we thought justified putting hot water in them, and we steamed them and they made excellent wells. And I have drilled plenty of others that I thought would be good wells and that didn't do very well; it is in the game. This sulphur is sort of a hazardous game; and if you haven't something to go in with, you better not take out too big a stack."

No preparation for the mining of sulphur other than exploratory drilling was begun during the five-year period or thereafter up to the filing of the suit.

 It is a well-settled general rule that leases of this character import an implied covenant to reasonably develop the mineral resources of the demised premises. Upon the discovery, therefore, of sulphur in each of the wells 3, 4, and 5, there was an implied

obligation on the part of the lessee to do whatever was reasonably necessary under the circumstances (1) to ascertain whether the deposit existed in commercial quantities; and (2) thereafter to reasonably develop the lease as to sulphur, both as regards exploration and production. Under the holding of the Commission of Appeals in Waggoner v. Sigler Oil Co., 284 S. W. 921, breach of this implied covenant would forfeit the lease, and this suit was originally brought under the doctrine there announced. June 28, 1929, the Supreme Court overruled this doctrine, 118 Tex. 509, 19 S.W.(2d) 27, 31, and held that the remedy for breach of implied covenants in mining leases is damages, or, in a proper case, equitable relief 'by way of specific performance, and, in the alternative, cancellation. The limitations which appellant seeks to have read into the lease are based (1) upon discovery of sulphur in commercial quantities during the five-year period, and nonproduction of any mineral on June 29, 1927; and (2) discovery of sulphur in commercial quantities in well No. 5 on August 22, 1927, and nonproduction of sulphur thereafter within a reasonable time.

■ Manifestly there is no express language of the lease providing for its determination upon either of these contingencies. The theory of appellant, as we gather it from the brief and argument, is that this interpretation follows necessarily from the fact that the grant was only for the purpose of mining and the main object of the grant was production from which rentals in the form of royalties would accrue to the lessor. The gist of appellant's construction under clause 1 is that, since production was manifestly the main purpose of the lease, it was therefore not in the contemplation of the parties that there should be any extension of the exploratory period beyond the five years, if any mineral was discovered in paying quantities during that period, and the lease would thereupon terminate by limitation unless some one of the minerals covered by the lease was then being produced.

Following the same course of reasoning, appellant construes clause 2 to mean that once a mineral is discovered continuous production, either immediately or within a reasonable time, alone will extend the life of the lease.

In effect clause 1 is construed to exclude the privilege of extending the exploratory period under clause 2, if during the five-year period a mineral has been discovered in commercial quantities. We are unable to give this construction to either of the two clauses.

Clause 1, eliminating the privilege of extending the exploratory period beyond the five years, is the usual clause now found in oil and gas leases. Under it production at its close is essential to the continued life of the lease. It matters not what may have transpired during the five-year period, what exploration or what preparation for production has been made, or what degree of proximity thereto has been reached. Unless there is actual production at the end of the five-year period, the lease terminates eo instanti according to its express terms. On the other hand, where the several express provisions (not here involved) have been complied with, the lease by its express language is to "remain in force for a term of five years." All of the express provisions for keeping the lease alive during the five-year period were complied with. Under such circumstances the lease became absolute for the five-year period in so far as any limitation on the estate was concerned. We do not understand appellant to contend that discovery and failure to produce sulphur worked a determination of the estate during the five-year period, but that such discovery during the period terminated the estate at its close if at that time there was no production, regardless of clause 2. There is as cogent ground for the former as for the latter view. In order to read either interpretation into the lease, resort must of necessity be had to the implied covenant to produce after discovery. The language extending the exploratory period under clause 2 is as positive and certain as that providing for an absolute five-year exploratory period. But one condition is attached to this extension privilege, and that is that an oil well be then drilling. If so, the exploratory period is expressly extended. The parties have so bound themselves, and so should they be held bound.

While it is unquestionably true that the manifest main purpose of the lease was production from which the lessor would derive a royalty, and that therefore production upon discovery in commercial quantities was an inescapable obligation of the lessee; still that obligation was not imposed by any express language of the lease, nor is there any provision for forfeiture or termination of the lease for breach of such obligation. It belongs, therefore, to that character of implied covenants, breach of which gives an action for damages, or other above-stated appropriate remedy; but does not terminate the estate either ipso facto as upon limitation or at the option of the lessor as upon condition subsequent. Where the lease expressly provides for the continued duration of the estate during the existence of express conditions, to hold that it may be terminated while those conditions exist on account of some implied obligation or covenant, would be doing violence to the language chosen by the parties to the instrument to express their intention and define their respective rights and obligations.

But, contends appellant, to hold that the lease may be kept alive by continuous drill-

ing alone, after the discovery of some mineral in commercial quantities, would permit the lessee arbitrarily or even fraudulently to refrain from or to discontinue production, and thus defeat the manifest purpose of the lease. We have not here an arbitrary or fraudulent failure to perform the implied covenant for reasonable development. That equity would afford ample remedy in such circumstances we have no doubt. The question here, stated most strongly for appellant, is whether a limitation can be read into the lease for failure to produce, either immediately or in a reasonable time after discovery of the existence of a mineral in commercial quantities. Clearly, as already stated, there is no express limitation on that account, and the law should not imply one. Nor is there substantial merit, we think, in the suggestion that the purpose of the lease might be altogether thwarted without such limitation. In the absence of special circumstances not here involved and which are amply taken care of through implied covenants, the inducement to production affects the lessee as strongly as it does the lessor. The continued drilling provided for in the lease as a condition precedent to its continued life entails great expense, which would be altogether lost but for subsequent production. Thus a very cogent deterrent to nonproduction is expressly provided for, which the lessor may well have regarded sufficient to insure against the contingencies pictured by appellant.

■ We pass to a consideration of the last portion of clause 2 reading, "and if oil or gas or other minerals shall be discovered this lease shall remain in force as long thereafter as lessee continues to produce any one of said minerals." Appellant contends that this language imports a limitation which terminates the estate upon discovery of a mineral in commercial quantities, unless there is production within a reasonable time. We do not so construe it. ·There is nothing in the language used which would continue the lease merely upon discovery in commercial quantities. It is only actual production that would continue the life of the lease under this provision. A holding that it would terminate for failure to produce must necessarily be based upon an implied covenant to produce after discovery.

■ Aside from this we think it clear that the provisions for continuing the life of the lease by production are cumulative of the provisions for its continuance by drilling. So long as there is compliance with the express provisions either for drilling or production, there is no termination of the estate.

■ Our discussion thus far has been under the assumption that the evidence showed or warranted a finding that sulphur in commercial quantities was actually discovered in wells 3, 4, and 5. We are not prepared to hold, however, that the evidence will support a finding of actual discovery in paying quantities. While amply sufficient to support a finding that the evidence of commercial quantities was quite favorable, it is equally clear that there could be no certainty that commercial quantities existed until a plant was constructed and put in operation, and actual mining commenced. The testimony of Keever demonstrates that the development, so far as sulphur was concerned, was still in the exploratory stage, and could not be advanced to the actual discovery in paying quantities stage, until a plant was constructed and mining begun. In other words, before there could be discovery in paying quantities, there must be production. If we should attempt to apply appellant's construction of the lease to the facts we would be met with insurmountable difficulties. The first evidence of the existence of sulphur was March 29, 1927, just ninety-two days before the expiration of the five-year period. Keever gives ninety days as the minimum time for constructing a plant, without which there could be no production. Can it be reasonably contended that immediately upon this discovery the Production Company was bound, at the risk of forfeiting the lease, to begin the erection of a plant and have it in operation and actually producing sulphur in commercial quantities by June 29, 1927? And suppose the Production Company had taken this view of the lease and had exerted every effort to that end, but due to some unforeseen and unavoidable contingency the ninety-two days remaining had not proved sufficient. Could it then be reasonably asserted that the lease terminated because there was no production at the end of the five-year period, although at that time an oil well was in drilling in full compliance with clause 2? Manifestly these questions must be answered in the negative; for it would be unreasonable to hold the lease terminated while the lessee was engaged in an act which by its express terms continued it in force, and had done or neglected nothing which the lease required or which could reasonably be expected of him under its provisions. If then the lease is to expire by limitation for failure to produce after discovery, what standards are to be applied to the action or failure to act of the lessee? In the first place, what character of showing must be made regarding the deposit to require the lessor to begin the erection of a plant? Must he begin such erection immediately there is a showing sufficiently favorable to warrant a fair inference that the deposit exists in commercial quantities, and, if so, whose judgment is to determine whether the showing meets this test? Or has he some latitude or discretion as to whether further exploratory drilling would be prudent or advisable before incurring such an outlay? If there is a margin for such latitude or discretion, what are its extreme boundaries or limi-

tations, and by what standards or criteria are they to be determined? Similar questions would arise in the preparation for and construction of the plant; and all of these questions are pertinent in the light of the methods employed in mining sulphur as detailed by Keever. It is true that the obligation for reasonable development is implied. But here, as in the Sigler Case, the lessee's duty as regards development after discovery is not defined in the lease, and "breach of the lessee's implied obligation for reasonable mineral operation will not authorize the forfeiture of the lease as for breach of condition subsequent, such obligation being a covenant."

As was said in Decker v. Kirlicks, 110 Tex. 94, 216 S. W. 385, and quoted with approval in the Sigler Case: "The authority to forfeit a vested right or estate should not rest in provisions whose meaning is uncertain and obscure. It should be found only in language which is plain and clear—whose unequivocal character may render its exercise fair and rightful."

Peculiarly apropos the present discussion is the following language of Chief Justice Stayton, in Benavides v. Hunt, 79 Tex. 392, 15 S. W. 396, 399:

"It is further insisted that the part of the tenth paragraph which obligated appellees 'to use all economy in the conduct and management of said mining enterprise' gave another condition, on non-compliance with which appellants were entitled to terminate the estate.

"We are of opinion that this proposition cannot be sustained; and, if for no other reason, because what would be deemed the 'use of all economy' would be too uncertain to recognize as a condition on which a forfeiture might rest.

"It would vary as much as the opinions of witnesses might vary on a matter of fact about which no fixed rule determines compliance or non-compliance. Right to forfeit estates vested cannot exist by reason of the existence or non-existence of a state of facts not clearly defined."

From the foregoing statement of the material facts it is quite clear that there has been no abandonment that would work a forfeiture of the lease. The record shows continuous exploration up to the very time of production in September, 1927, from which time the lease was kept in force both by production and by drilling.

■ Appellant's third contention is thus expressed in its eighth proposition: "The judgment of the trial court, at all events, is erroneous in that said judgment is so broad that it might be construed as denying the existence of the royalty interest admittedly owned by the appellant. The judgment not only denies appellant's right to a recovery of the sulphur on the theory that the lease from Chase to Weed has terminated but also denies appellant's right to recover damages represented by additional royalties and this portion of the judgment is so broad that it might be construed as denying appellant's ownership of a royalty interest. Accordingly, the judgment should at least be modified so that it will not prejudice appellant's right to royalties on account of the production of sulphur under the lease involved."

The petition sought a cancellation of the lease and in the alternative damages for failure to reasonably develop. The alternative prayer for damages was abandoned, and a directed verdict was returned "for the defendants." The judgment was in effect that plaintiff take nothing against the defendants upon any cause of action asserted in its second amended original petition. No complaint was made of the judgment on this score in the trial court, nor is it made the basis of any assignment of error. But aside from this we think the point is not well taken. The cause of action asserted in the amended petition was predicated solely upon expiration of the lease by limitation or abandonment, and in the alternative damages for failure to reasonably develop. Ownership of the royalties was not involved, except, perhaps, inferentially, under the alternative plea, in this way, if appellant had no interest under the lease, then it could not maintain an action for damages for failure to reasonably develop, and nonownership would have been a defense to that plea. But the case was not tried on that theory, and we do not think the judgment can be construed as affecting any royalty rights appellant may hold under the Weed lease. However, we can see no objection to modifying the judgment in this regard at the cost of appellant.

The trial court's judgment is so modified as to be without prejudice to any royalty interest appellant may hold under the Weed lease, and, as so modified, it is affirmed. All costs, trial and appellate, are assessed against appellant.

*Modified and affirmed.*