Cook *v.* Village of Paulding et al.

[Cite as Cook v. Village of Paulding, 4 Ohio Misc. 111.]

(No. 19222—Decided February 23, 1965.)

Declaratory Judgment: Court of Common Pleas of Paulding County.

*Messrs. Weaner, Hutchinson & Zimmerman,* for plaintiff.
*Mr. Harvey E. Hyman,* for defendants.

HITCHCOCK, J. Plaintiff asks the court to declare a perpetual mineral lease for water, executed by his parents, void for want of mutuality; or, in the alternative, to grant him any legal and equitable relief to which he may be entitled. The cause has been submitted upon an agreed statement of facts together with briefs submitted by each party.

On August 17, 1948, plaintiff's late parents, Floyd A. Cook and Elizabeth M. Cook, as lessors, and W. G. Rumbaugh, R. W. Crowell, and Dewey D. Byer, as members of the Board of Public Affairs of the Village of Paulding, Ohio, as lessee, duly executed and acknowledged an instrument in writing titled "Perpetual Lease." This instrument grants to the board, its successors and assigns "* * * all the water in and under a particular 10 acre tract then owned in fee simple by the lessors * * * for and during the full term of twenty-five (25) years next ensuing, from the first day of August, 1948, and renewable forever, or as much longer as water is found in paying quantities thereon, at the option of the lessee, at and upon the terms and subject to the covenants, conditions and stipulations herein expressed and declared of and concerning the same. * * *" It also states that "The agreement terms and conditions of this lease shall extend to and be binding upon the heirs, executors, administrators, successors and assigns of the parties hereto."

The lease also provides as follows:

"The lessee and lessor mutually covenant and agree by and between themselves, as follows:

"Article 1. This lease is made for the purpose of granting unto the lessee, their successors and assigns, all the water in and under the hereinbefore described premises, together with the exclusive right to enter thereon at any and all times for the purpose of drilling and operating for water, and to erect and maintain all buildings and structures, and lay all pipes necessary for the production and transportation of water taken from said premises.

"Article 2. It is mutually agreed that said lessor may use said lands for agricultural purposes in so far as such purposes do not interfere with lessee's rights.

"Article 3. The lessee shall pay to the lessor on the first

day of each month, or as soon thereafter as practicable, the sum of Five Dollars ($5.00) monthly, per well, so long as said lessee shall operate a water well or wells upon said premises hereinbefore described.

"Article 4. The lessor reserves to himself and his heirs and assigns forever the privilege of being allowed a tap-in for water supply into the water mains connecting said wells with the Village water mains, if at any time he or any of his successors in interest should desire it.

"Article 5. That for the water so used by the lessor, should he exercise his option to tap-in said line, in an amount less than 400,000 gallons per year, there shall be no charges made by the lessee, their successors and assigns, and said right of lessor is recognized as part consideration in the granting of this lease.

"Article 6. In the contruction of any and all buildings and improvements on said premises, the lessee shall obey, conform to and observe all laws, ordinances, rules and regulations of all legally constituted authorities and, to the extent thereby required, fully protect all adjacent buildings and improvements and shall also at all times indemnify, protect and save harmless the lessor and the above described premises from and against any liability in favor of the owners or occupants of adjacent premises, or any other person or persons by reason or on account of the construction and improvement.

"Article 7. It is further mutually agreed that all buildings of whatever nature and all pipes and machinery installed by said lessee on said premises shall be regarded as personal property, and may be removed by the lessee upon termination of this lease. Provided, however, that upon removal of said personal property the lessee shall restore the premises to their original condition as far as may be practicable.

"Article 8. That upon the abandonment by said lessee of the water well operations upon said premises, this lease shall be considered terminated and of no effect. In which event, however, the lessee shall have a reasonable time in which to remove said personal property, and to restore the said premises to their original condition."

At no time did the electors of the village of Paulding, at a special or general election, authorize the village to enter into this lease, or ratify it subsequent to its execution.

Buildings now on the property subject to this lease were

constructed about 1950. One building, about fifteen feet by twenty feet, is used, and has been since its erection, to house equipment needed for aerating and filtering the water pumped from the wells on this property.

Plaintiff, who was ten years old when his parents executed this "Perpetual Lease," acquired title to the real estate leased on October 15, 1963. He has lived on the farm of which the leased premises are a part his entire life and became owner of a fractional interest therein upon the death of both his parents in 1960. He has been on the leased premises many times since August 17, 1948, and has used the water therefrom, which he continues to do. Plaintiff has known of the existence of the buildings on the leased premises and has had free access to and from them. The land around these buildings, since their erection, has never been farmed. Sometime after October 14, 1963, plaintiff discovered that "aeration and filtration" of the water taken from the wells on the leased property was being done in a building located thereon.

Plaintiff has made a demand on the defendant to cease the "aerating and filtering" of water on the premises but defendants have refused to comply therewith.

The building which houses the aeration and filtration equipment prevents the agricultural use of the land upon which the building is constructed and makes more difficult the farming of the land lying immediately around it.

As it is common knowledge in this community that plaintiff operates, as did his parents, a dairy farm upon the lands of which the leased premises are a part, the court takes judicial notice of this fact, also of the fact that the Village of Paulding has never adopted a charter form of government as, under the Ohio Constitution, it might have; and that local wells all too often produce water containing noticeable amounts of hydrogen sulphide, the removal of which is most commonly accomplished by aeration.

Both the pleadings and the agreed statement of facts are silent as to: (1) Who prepared this instrument titled "Perpetual Lease"; (2) whether or not it is of any consequence to plaintiff or to his ancestors and predecessors, that the water lessor is entitled to and does receive without charge from the lessee is "aerated and filtrated." From this silence in the cir-

cumstances the court will assume that the lease was mutually prepared by the parties acting advisedly and at arms length, so that neither is entitled to a more favorable construction than the other.

## I.

Plaintiff says this lease lacks mutuality because it is not binding upon the village because the village has never complied with the terms of Section 3981, General Code (now Section 743.24, Revised Code), as in effect on August 17, 1948, in pertinent part reading:

"A municipal corporation may contract with any individual or individuals * * * for supplying water for fire purposes, or for cisterns, reservoirs, streets, squares and other public places within the corporate limits, or for the purpose of supplying the citizens of such municipal corporation with water for such time, and upon such terms as may be agreed upon. But such contract *shall not be executed or binding upon* the municipal corporation until it has been ratified by a vote of the electors thereof, at a special or general election, and the municipal corporation shall have the same power to protect such water supply and prevent the pollution thereof as though the waterworks were owned by such municipal corporation." (Emphasis supplied.)

The first question to be determined is whether or not this lease is binding upon the municipal corporation. If it is not, then truly it lacks mutuality and may be cancelled.

Contracts made, executed, and to be performed in the same state are, of course, governed by the law of that state on the date of their making. Moreover, Section 28, Article II, of the Ohio Constitution, as in effect since 1851, proscribes the impairment of contracts. It is also fundamental law that contracts are to be interpreted and their meaning ascertained in light of all the circumstances under which they were entered into and the purpose to be served. A lease is a species of contract for the possession and profits of lands and tenements either for life, or a certain period of time, or during the pleasure of the parties.

A review of Ohio law discloses, in addition to Section 3981, General Code, two other sections of the General Code to have been in full force and effect on August 17, 1948, and possibly relevant to this case: *viz.*, Sections 4361 and 9324, General Code.

116

On August 17, 1948, Section 4361, General Code (now Section 735.29, Revised Code), in pertinent part, provided:

"The board of trustees of public affairs shall manage, conduct and control the waterworks, * * * furnish supplies of water * * * collect all water * * * rents, and appoint necessary officers, employees and agents. * * * The board of trustees of public affairs shall have the same powers and perform the same duties as are possessed by, and are incumbent upon, the director of public service provided in Sections 3955, 3959[1], 3960, 3961, 3964, 3965, 3974, 3981, 4328, 4329, 4330, 4331, 4332, 4333 and 4334 of the General Code, and all powers and duties relating to waterworks in any of those sections shall extend to and include electric light, power and gas plants and such other similar public utilities, and such boards shall have such other duties as may be prescribed by law or ordinance not inconsistent herewith."

Section 9324, General Code (now Section 4933.04 of the Revised Code), then read:

"The municipal authority of any city or village or the trustees of any township, in which a gas or water company is organized, may contract with such company for lighting or supplying with water the streets, lands, lanes, squares and public places in such city, village, or township."

And Section 3961, General Code (now Section 743.07, Revised Code), mentioned in Section 4361, General Code, set out above, read:

"Subject to the provisions of this title, the director of public service may make contracts for the building of machinery, waterworks buildings, reservoirs and the enlargement and repair thereof, the manufacture and laying down of pipe, the furnishing and supplying with connections all necessary fire hydrants for fire department purposes, keeping them in repair, *and for all other purposes necessary to the full and efficient management* and construction of waterworks." (Italics supplied.)

In respect to the competency of the lessee to enter into this lease, neither side has suggested that any constitutional provision, ruling case law, or statute affects that issue here and the court has found none.

---

[1]This section, concerning disposition of waterworks revenues and taxes for waterworks amended, effective August 14, 1943.

As the cited statutes deal with the same subject and evince a clear purpose to authorize municipalities to operate water-works in a truly business like manner they are doubtless to be construed in *pari materia.*

At first blush, Section 3981, General Code, seems plainly to say, "* * * such contract shall not be executed or binding upon the municipal corporation until it has been ratified by a vote * * *." But this contract is to be one for:

"* * * supplying water for fire purposes, or for cisterns, reservoirs, streets, squares and other public places within the corporate limits, or for the purpose of supplying the citizens of such municipal corporation with water for such time, and upon such terms as may be agreed upon * * *."

Also, it appears to contemplate situations where the water-works is owned by other than municipal authority for it concludes that in cases where the contracts contemplated are ratified the municipal corporation shall have the same power to protect such water supply and prevent the pollution thereof "* * * as though the waterworks were owned by such municipal corporation." (Emphasis supplied.)

In view of Section 3961, General Code, as in effect on August 17, 1948, made applicable to boards of trustees of public affairs of Ohio villages by the express language of Section 4361, General Code, the board in this case was certainly authorized to enter into this lease which was freely entered into by the contracting parties and was designed to provide a source of water with which to supply the waterworks owned by the municipality. No citation of authority is necessary to arrive at the conclusion that providing an excellent source of water supply is a purpose "* * * necessary to the full and efficient management * * * of waterworks."

Consequently, the court finds itself in agreement with the opinions of Attorney General Edward C. Turner (later Judge of the Supreme Court of Ohio) in O. A. G. No. 484, 1915, vol. 1, p. 987; of Attorney General John W. Bricker (later Governor Bricker), O. A. G. 1934, No. 2475; and Judge Reed, Ottawa County Common Pleas Court, in *Moore* v. *Elmore* (1910), 13 N. P. (N. S.) 651, 23 O. D. (N. P.) 50, where it was held that Section 3981, General Code, had no application to situations such as this (i. e. where the water supplier was merely to deliver to the city

a sufficient amount of raw water which the city is to filter, distribute and sell) although a later and more specific statute, Section 3809, General Code (repealed in 1927), was in each of these cases held to be controlling as to the precise issue determined.

If it be asked what purpose Section 3981, General Code (still retained as Section 743.24, Revised Code), can then possibly serve, it would seem its purpose is to prevent a privately owned waterworks from entering into a contract with a municipality, binding upon all water users, the obligation of which is forever unimpairable, without a vote of the electors. To the court this seems purpose enough, and it is noted that the last sentence of Section 8.16 of the text to the 10th Edition of Ellis' Ohio Municipal Code (by James W. Farrel, Jr.), reads: "Municipalities may, however, enter into contracts for public utility services without following the statutory requirements." For this statement no explanation is given or authority cited and it is probably incorrect because statutes like Section 9324, General Code (now Section 4933.04, Revised Code), do authorize such contracts, as has Section 9.30, Revised Code, since September 29, 1955.

The court concludes that the "perpetual lease" set out in exhibit "A" to the agreed statement of facts is a valid one, binding upon both parties.

## II

The remaining issue is whether the lessee has exceeded its authority under the lease to do all things "* * * necessary for the production and transportation of water taken from said premises," by using a portion of said premises for stated purposes plus the purpose of the "aeration and filtration" of such water.

True it is that perpetual leases are not favored in the law. See *Hallock* v. *Kintzler* (1943), 142 Ohio St. 287. Yet competent people are free to deliberately enter into such agreements as the court here has found the original contracting parties to have done.

This leaves for decision the meaning of what did the parties here contemplate by the language they used, particularly the word "production."

Plaintiff by way of analogy cites and urges upon the court these authorities from oil and gas lease cases:

"'Production' has been defined as signifying to bring oil, gas or mineral to the surface. When separation from the earth has been accomplished the 'production' is completed." *W. S. Hatch Co.* v. *Public Service Commission* (1954), 3 Utah 2d 7, 277 P. 2d 809, 813.

"Under oil and gas lease for ten years and as much longer as oil is 'found' in paying quantities, word 'found' is synonymous with word 'produced,' which refers to oil when brought up to the surface." Paragraph one of the syllabus of *Tedrow* v. *Shaffer* (1926), 23 Ohio App. 343.

The force of plaintiff's argument is not lost upon the court, especially as perpetual leases are not favored in the law. Here, however, considering the lease as a whole, and the acts of the lessors who made this lease, the court concludes that the word, "production," as used in this lease means production of marketable water. See *Rogers* v. *Osborn* (1953), 152 Tex. 540, 261 S. W. 2d 311, concerning an oil and gas lease.

The reasons are that the lease in articles 4 and 5 provides to lessors and any successors (plaintiff) "a tap-in for water supply into the water mains connecting said wells with the village water mains" for 400,000 gallons of water per year without charge. Plaintiff admits using the water so provided and the court notes from the published schedule of local commercial water rates that the present economic value of this "tap-in" right considerably exceeds the value of the cash rent required by the lease.

Moreover, plaintiff has failed to make any showing whatever that it was immaterial to the original lessors or to plaintiff, as to whether or not raw or marketable water was to be received from the "tap-in" provision, and use of the term "with the village water mains," in the mind of the court, makes it conclusive that "marketable" water ready for all normal use was clearly intended. The court also notes that the lease contemplates the possibility that this "tap-in" provision may later benefit heirs and assigns and is of the opinion that the lease requires the lessee to provide such facilities therefor as are necessary to make 400,000 gallons of water per year reasonably available to any person or persons entitled.

The petition of the plaintiff is dismissed at his costs.

*Petition dismissed.*