ROGERS et al. v. OSBORN et al.
No. 12362.

Court of Civil Appeals of Texas.
San Antonio.
May 28, 1952.

Rehearing Denied July 16, 1952.

Lewright, Dyer, Sorrell & Redford, Corpus Christi, Strickland, Wilkins, Hall

& Mills, Mission, John A. Pope, Jr., Rio Grande City, for appellants.

Lloyd & Lloyd, Alice, H. P. Guerra, Jr., A. Vale, Rio Grande City, for appellees.

NORVELL, Justice.

Certain operations described as "periodic flowing" were undertaken by appellees to bring in an oil or gas well, and the question presented by this lawsuit is whether or not such actions may be properly considered as "drilling or re-working operations" under the provisions of the oil and gas lease involved.

Appellants are the named lessors in a written instrument dated September 21, 1942, and the successors in interest of said lessors. The appellees are the lessee and those claiming under him.

The pertinent clauses of the lease are contained in paragraphs 2 and 5 thereof and are as follows:

"2. Subject to the other provisions herein contained, this lease shall be for a term of five (5) years from this date (called 'primary term') and as long thereafter as oil, gas or other mineral is produced from said land hereunder."

"5. * * * If at the expiration of the primary term oil, gas or other mineral is not being produced on said land but lessee is then engaged in drilling or re-working operations thereon, this lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas or other mineral so long thereafter as oil, gas or other mineral is produced from said land."

The jury findings were for appellees and appellants' position here is that they were entitled to judgment declaring the lease terminated as a matter of law, and consequently their motion for an instructed verdict or for judgment non obstante veredicto should have been granted.

The following facts are undisputed:

The primary term of the lease expired on September 21, 1947, and prior thereto on May 15, 1947, the actual drilling of a well, designated as Clopton No. 1, was commenced. Casing was set at 6,256 feet on June 21st. This was perforated at the 3,900, 4,400, 5,600 and 5,690–5,700 foot levels. The Christmas tree (a piece of equipment with numerous valves for flowing and operating the well) was set on July 20, 1947. Tubing was run in the casing and an American packer set. The derrick was torn down and the drilling tools taken away on July 30th. From then until November 12th (and perhaps longer), the well was subjected to the process of "periodic flowing," hereinafter described.

A re-working rig was moved over the hole on November 12th, but the operator was unable to complete the well as a producer. He moved off on November 29th, and since that time no work of any kind or character has been done upon Clopton No. 1. (There seems to be some dispute as to this, as appellees assert that attempts to bring in the well continued until the present suit was filed.)

On October 25th, appellants notified appellees in writing of their claim that the lease had terminated. However, on October 31st appellees commenced the actual drilling of Clopton No. 2, which was completed as a gas producer. The well was shut in for lack of market and appellees have tendered to appellants the sum of $500 per year for said shut in gas well, in accordance with the terms of the lease. It is the gas production of Clopton No. 2 which is relied upon as perpetuating the lease under the clause which provides that the same shall remain in force as long "as oil, gas or other mineral is produced from said land."

There is one preliminary matter to be disposed of. Appellants contend that as work on Clopton No. 2 was not in progress at the time of the expiration of the primary term (September 21, 1947), production from said well can not be relied upon to perpetuate the lease. This result is arrived at by construing the clause as if the words, "which were in progress at the time of the expiration of the primary term," immediately followed the word, "operations," the second time the same was used in the clause, viz.:

"If at the expiration of the primary term, oil, gas, or other mineral is not being produced on said land but lessee is then engaged in drilling or re-working operations thereon, this lease shall remain in force so long as operations *which were in progress at the time of the expiration of the primary term* are prosecuted, with no cessation of more than thirty (30) consecutive days, etc."

Neither party has cited a case directly in point upon the conflicting constructions of this particular clause and we have found none. However, it seems that appellants' position is untenable under the primary rule that, "a written instrument must ordinarily be interpreted to mean what on its face it purports to mean, unless some good reason can be assigned to show that the words used should be understood in a different sense." 12 Am.Jur. 751, Contracts, § 229. No limitation is placed upon the word "operations" the second time it is used in the clause, but it possesses the same broad connotation or meaning that it has when used the first time in the clause. There is no verbal basis for restricting "operations" to those actually being prosecuted at the end of the primary term. The clause means that, "If at the expiration of the primary term oil, gas or other mineral is not being produced on said land but lessee is then engaged in drilling or reworking operations *on said land,* this lease shall remain in force so long *as drilling or reworking operations on said land are prosecuted with no cessation of more than* (30) consecutive days," etc.

Under this clause, the lessee may keep the lease in force after the primary term by conducting continuous drilling or reworking operations on the land with no cessation of more than thirty consecutive days, providing, of course, drilling or reworking operations were being prosecuted at the termination of the primary term. The drilling of Clopton No. 2 was a drilling operation upon the land. The question then is whether or not continuous drilling or re-working operations (with no more than 30 days cessation) were prosecuted upon the land covered by the lease from the termination of the primary term to the commencement of drilling operations upon Clopton No. 2.

The jury found that drilling operation and re-working operations upon Clopton No. 1 were maintained during that period of time. Appellants take the position that the evidence conclusively shows the contrary as a matter of law.

This brings us to a consideration of the "periodic flowing" process above referred to, which was used in an attempt to bring in Clopton No. 1, as a producer.

Appellees' testimony shows that during the drilling of Clopton No. 1 heavy gas pressures were encountered. I. K. Howeth, a geologist and oil producer, testified that a number of sands were penetrated before the 6,256 foot depth was reached and that tremendous gas pressures were encountered; that twice the well attempted to blow out and it was almost impossible for the drillers to hold the well in; that at times the gas pressure would be between three and four thousand pounds to the square inch; that in order to control the pressure, it was necessary to use extremely heavy drilling mud weighing 13.6 pounds to the gallon, as compared with the weight of water which is 8.3 pounds per gallon; that the sand strata responsible for the high gas pressure was not known; but it was certain that such sands would make a large commercial gas well; that in order to control the gas pressure over 810,000 pounds of Baroid, a mud producing substance, was pumped into the well; that much of this weight material was not returned to the surface by the mud circulating pumps, but would "just disappear and go into some reservoir down in the earth"; that this disappearance of mud into the underlying structures is known as "losing returns"; that when this occurs, the mud is forced into the underlying geological formations carrying the gas and has a tendency to seal off the flow of gas into the hole; that after casing was set, perforated, and tubing run it was necessary either to swab the tubing or flow the well to complete the same as a producer; that swabbing was not a feasible operation on this well because of the high gas pressures encountered, the swab would probably

have been blown out of the well and there was danger that control of the well itself would be lost; that the only practical way to bring in the well under such conditions was to flow the well, that is, open up a valve and allow the gas to flow in the hope that the well would rid itself of mud and clean out.

In numerous particulars, Howeth's testimony was corroborated by those who had been in actual charge of operations at the well. It appears that from July, 1947, to sometime during the first part of November, 1947 (and after drilling operations on Clopton No. 2 had commenced) appellees caused Clopton No. 1 to be "flowed" from one to three times a week. A valve on the Christmas tree was opened and left in that condition for an hour or two and sometimes for half a day in order to blow out the accumulated mud and fluid. When the flowing ceased, the valve would be closed to permit the pressure to build up again so that the procedure could be repeated. Howeth stated that this process was sometimes called "rocking" a well, but that this expression was not wholly accurate. He preferred the term "periodic flowing." It is undisputed that the process of opening a valve and allowing the well to flow for a while and then permitting the pressure to build up under a closed valve is an operation often used by drillers in an attempt to clean mud or other substances from the well and bring in a producer. One of appellants' witnesses testified that five days was the limit within which the "rocking" or "periodic flowing" process was effective, and that if the well were not brought in by that time, a re-working rig should be set up. On the other hand, certain of appellees' witnesses testified that they knew of wells which were successfully completed by being subjected to periodic flowing for periods of time ranging from three to eighteen months.

We think a jury question was raised by the evidence. The testimony of appellees' witnesses when given full credence shows that the periodic flowing of Clopton No. 1 was something more than mere testing, such as was disclosed by the case of Adams v. Bennett, Tex.Civ.App.,

282 S.W. 909, relied upon by appellants. (Most of the discussion contained in the cited case relates to the question of whether or not the well there involved was a producer.) The jury found that on September 21, 1947, appellees were engaged in drilling and re-working operations and refused to find that there was a thirty-day cessation of such operations from September 21, 1947, to January 2, 1948. No objection is here urged to the form of the questions employed in submitting the controlling issues. The term "drilling operations" was defined as meaning "actual work or operations done in a good faith effort to cause a well to produce oil and gas or oil or gas in paying quantities as an ordinarily competent operator would do in the same or similar circumstances." A similar definition was given with reference to "re-working operations." No objection to these definitions was made. Appellants' position is that the "periodic flowing" of the well could not as a matter of law constitute either "drilling operations" or "re-working operations."

Of course, if the term "drilling operations" be construed as meaning that a drill bit must actually be turning in the hole and "re-working operations" be construed as meaning work done by a re-working rig, there were no drilling or re-working operations being prosecuted at the end of the primary term, nor prior to November 12, 1947, when a re-working rig was set over the hole. But such constructions are not correctly applicable to the terms used in the clause involved here. In rejecting the proposition that the term "drilling operations" refers to and means the penetration of the bit in forming the well hole, Judge Hutcheson, speaking for the Fifth Circuit Court of Appeals, in Humphrys v. Skelly Oil Co., 83 F.2d 989, 992, said:

"The second point labored by appellant, the restricted meaning to be given to the words 'drilling operations' used in paragraph 14, is, we think, easily disposed of against his contention. It is quite plain that the principal apparent purpose of the parties which the lease was concerned to express was not the making of a hole in,

but the production of oil from, the ground, and it would not be reasonable, in the absence of compelling considerations, to say that the parties deliberately chose terms which were intended to give dominating effect to one stage of the preparatory work over another. Summers on Oil & Gas, pp. 362–363; McCallister v. Texas Co. (Tex.Civ.App.) 223 S.W. 859; Terry v. Texas Co. (Tex.Civ.App.) 228 S.W. 1019; Hudspeth v. Producers' Oil Co., 134 La. 1013, 64 So. 891; Smith v. Gypsy Oil Co., 130 Okl. 135, 265 P. 647; Fast v. Whitney, 26 Wyo. 433, 187 P. 192; Cromwell v. Lewis, 98 Okl. 53, 223 P. 671; Robinson v. Gordon Oil Co., 258 Mich. 643, 242 N.W. 795."

We think that a reasonable good faith effort to bring in a well after the hole has been completed constitutes a "drilling operation" the same as does the actual turning of the bit in the hole. Cf. Morrison v. Swaim, Tex.Civ.App., 220 S.W. 2d 493, wr. ref., n. r. e.

Appellants' points disclose no reversible error. The judgment of the trial court is affirmed.