MARTHA R. CLOPTON ROGERS ET AL V.
W. B. OSBORN ET AL.

No. A-3824. Decided April 29, 1953.
Rehearing overruled October 28, 1953.
(261 S. W. 2d Series 311)

*Strickland, Wilkins, Hall & Mills* and *J. M. Burnett,* all of Mission, *John A. Pope,* of Rio Grande City, *Lewright, Dyer, Sorrell & Redford,* of Corpus Christi, for petitioners.

The Court of Civil Appeals erred in holding that if lessees were engaged in drilling operations or reworking condition at the end of the primary term, it was not necessary that lessees obtain production from those very same operations which they were conducting on the day the primary term ended in order to extend the lease. Producers Oil & Gas Co. v. Continental Securities Corp., 188 La. 358, 177 So. 668; Emery v. League, 72 S. W. 603; Zeppa v. Houston Oil Co., 113 S.W. 2d 612.

*A. J. Vale, H. P. Guerra, Jr.,* both of Rio Grande City, *Lloyd & Lloyd* and *E. G. Lloyd, Jr.,* all of Alice, for respondents.

In support of the opinion of the Court of Civil Appeals cited W. T. Waggoner Estate v. Sigler Oil Co., 118 Texas 509, 19 S.W. 2d 27; Guleke v. Humble Oil & Refining Co., 126 S. W. 2d 38; Phillips Petroleum Co. v. Rudd, 226 S.W. 2d 464.

MR. JUSTICE WILSON delivered the opinion of the Court.

This is a suit to terminate an oil and gas lease. The principal questions are: Whether work done upon a first well in an unsuccessful effort to make it produce at and after the expiration

of the primary term kept alive the lease; and if so, whether the drilling of and production from a second well commenced after the expiration of the primary term will support the lease. Our answer to the first is "Yes" and to the second "No".

For a detailed statement of the facts see the opinion of the Court of Civil Appeals at 250 S.W. 2d 296.

Before the primary term expired on September 21, 1947, Well No. 1 had been commenced on May 15. The derrick was torn down and drilling tools removed on July 30th. From then until November 12th the well was subjected to "periodic flowing". This was an effort to clean baroid and drilling mud out of the well by allowing it to build up a head of gas and then opening the flow valve into the pits. The head of gas was followed by a flow of oily mud. After the flow ceased it would be shut in to accumulate more pressure. At first this procedure was followed almost every day but it soon slowed down to once a week.

The uncontroverted evidence established that all cutting of new hole on Well No. 1 had been completed, all pipe cemented, and all flowing arrangements completed when the primary term expired on September 21st.

■ At that time there was no production from the lease. The word "production" means marketable oil or gas. Garcia v. King, 139 Texas 578, 164 S.W. 2d 509. There is positive testimony from lessees' witnesses that there was never any production from Well No. 1. The well was allowed to blow itself out a number of times in an effort to clean it, but neither party claims this as production. There was no "shut-in" royalty tendered for Well No. 1.[1] We hold as a matter of law that there was no production from Well No. 1. Freeman v. Magnolia Petroleum Co., 141 Texas 274, 171 S.W. 2d 339.

The lease terminated on September 21, 1947 unless some provision other than the primary term kept it alive. To accomplish

---

[1] The lease provided for a royalty on gas as follows:

"* * * (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; where gas from one or more wells producing gas is not sold or used, lessee may pay as royalty $500.00 per year, and upon such payment it will be considered that gas is being produced within the meaning of Paragraph 2 hereof; * * *"

this, lessees rely (first) upon reworking operations upon Well No. 1 and (second) upon the drilling of and production from Well No. 2.

Paragraph No. 5 of the lease is as follows:

"If prior to discovery of oil or gas on said land Lessee should drill a dry hole or holes thereon, or if after discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if lessee commences additional drilling or re-working operations within sixty (60) days thereafter or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three months from date of completion of dry hole, or cessation of production. If at the expiration of the primary term oil, gas or other mineral is not being produced on said land but lessee is then engaged in drilling or re-working operations thereon, this lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas or other mineral so long thereafter as oil, gas or other mineral is produced from said land * * *."

We will first consider the first sentence of paragraph 5. If, prior to discovery of gas, lessees drilled a dry hole, they had sixty days in which to commence additional drilling or reworking operations. Lessees plead that oil and gas were discovered in the first well. They offered opinion evidence upon which the jury found that gas in paying quantities was discovered "prior to September 21, 1947." Since lessees sought and obtained a finding that Well No. 1 was not dry, the dry hole clause had no application. We do not reach the question in St. Louis Royalty Co. v. Continental Oil Co., U.S. C.C.A., 5th Cir., 193 F. 2d 778.

This presents a situation where gas was discovered in paying quantities in Well No. 1 but never produced. The second alternative in this first sentence of paragraph 5 is: "or if after the discovery of oil and gas the production should cease from any cause" the lessee had 60 days to commence additional drilling or reworking operations. If production never began, it could not "cease" and by ceasing give the lessee 60 days in which to commence additional drilling. Clearly the first sentence of paragraph 5 did not provide for discovering but not producing gas. Our construction is supported by the fact that the royalty provision quoted in Footnote 1, supra, did provide for just this situation and required the payment of a specific shut-in royalty.

And we have held that where the "year" of this shut-in gas royalty clause straddles the date for the expiration of the primary term, the "shut-in" payment must be made during the primary term, or the lease expires. Freeman v. Magnolia Petroleum Co., supra. Therefore the first sentence of paragraph 5 cannot be used to prolong the life of the lease. Morrison v. Swaim, Texas Civ. App. 1949, 220 S.W. 2d 493, wr. er. ref., n.r.e.; Producers Oil & Gas Co., Inc., v. Continental Securities Corp., 188 La. 564, 177 So. 668.

We pass now to the second sentence.

■ The two conditions of the opening prepositional phrase are: (1) if "at the expiration of the primary term" gas was not being "produced on said lease," and (2) the lessee was "then engaged in drilling or reworking operations thereon". It is uncontroverted that no gas was being produced and the lessees were not "then engaged" in drilling hole. The second word "operations" ("so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days"), undoubtedly means both "drilling" and "reworking operations". It is not necessary to determine whether this lessee's efforts to clean out the well be defined as "drilling" or "reworking" because without objection the trial court used almost the same definition for both drilling and reworking. It would include almost any type of work. Since it was not objected to it is part of the jury's finding. It was:

"You are instructed that the term 're-working operations,' as used herein, means actual work or operations which have theretofore been done, being done over, and being done in good faith endeavor to cause a well to produce oil and gas or oil or gas in paying quantities as an ordinarily competent operator would do in the same or similar circumstances."

The jury found in response to Special Issue's Nos. 1 and 2 that on the expiration date (September 21st) lessees were then engaged in both drilling and reworking operations. For convenience we will discuss lessees' efforts as "reworking". Is there evidence to support this?

There is conflicting testimony by experts on whether the lessees' attempt to complete Well No. 1 were a method by which an ordinarily competent operator would have completed Well No. 1. Under the charge used in this case, we cannot hold as a matter of law that periodic flowing or "bleeding" of a well for a limited period is not included within either the term "rework-

ing operations" or the term "drilling" as defined in this charge. An actual reworking did occur during November 1947. We hold that there is some evidence supporting this finding but do not pass upon the trial court's definition of the words *drilling* and *reworking.*

There is no finding as to how long reworking operations continued or when they ceased. John Gun, an independent well-servicing contractor employed by lessees, testified that he moved his rig to Well No. 1 on November 12, 1947 for the purpose of "working over the well". He ceased work and moved his rig away on November 29, 1947. After that there is no testimony of any specific and tangible acts done on reworking Well No. 1 although there are general references to further work done on the well.

As we understand Special Issue No. 3,[2] it is a finding that the lessees were engaged in drilling operations for a period of 30 consecutive days between September 21, 1947 and January 2, 1948. This issue as worded does not fall within the second sentence of paragraph 5 because it is not a finding that there was "no cessation" of drilling operations for "more than 30 consecutive days". Also the issue as worded does not limit the "drilling operations" to those upon Well No. 1. Since it is uncontroverted that Well No. 2 was drilled during this period and Well No. 1 was not, except for periodic flowing, we presume that the jury based their answer to this issue upon the drilling of Well No. 2. It might possibly refer to the John Gun reworking of Well No. 1, but it is uncontroverted that this did not last thirty days. Therefore we have concluded that Special Issue No. 3 offers no support to the trial court's judgment.

Lessees offered opinion evidence that they still thought at the time of trial that Well No. 1 could be made into a producer. They testified that with the filing of this case on January 2, 1948 they ceased all efforts to make it produce. If the lessees had continued to work upon Well No. 1 it is possible that they might have made it into a producer, but there is no certainty

[2]
"SPECIAL ISSUE NUMBER THREE:
Do you find from a preponderance of the evidence that the defendants W. B. Osborn and Jewel Osborn and Mid-Continent Petroleum Corporation, were not engaged in drilling operations on the Clopton land in question for more then thirty consecutive days for any period of time from and including September 21, 1947, to January 2, 1948?
"ANSWER: 'They were not,' Or 'They were.'
"We, the jury, answer: '*Yes, They were.*'"

that they would. And the record conclusively establishes that their total effort expended on Well No. 1 had not at the time of trial (January 17, 1951) resulted in production from it.

■ Lessees were upon notice when they drilled Well No. 2 that Lessors then contended the lease had terminated. Under the facts of this case the lessees cannot tack the period of the drilling of and production from Well No. 2 to the period of reworking Well No. 1. In order to do that the lessees would have to borrow the words *commences additional drilling* from the first sentence of paragraph 5 and transpose them to the second sentence. The conditions contained in the two separate sentences should not be jumbled. See note in Oil and Gas Reporter, Vol. 1, No. 2, p. 1592. The second use of the word *operations* might be given the very broad construction used by the Court of Civil Appeals. This construction would allow a lessee to prolong a lease indefinitely and would take from the primary term much of its significance. The first two sentences apply to different factual situations. Since the first provides for "additional drilling" and the second does not, we hold that the second word *operates* as used in the second sentence does not include additional wells commenced after the expiration of the primary term. This sentence means that if production results from the continuous prosecution of the very operation being engaged in by the lessees upon the expiration of the primary term, the lease is good. This is not to be confused with the lessees' rights to drill additional wells under the "dry hole" and "if production ceases" sentence.

To sum up, this case reaches us with the lessees unable to avail themselves of the dry hole clause because Well No. 1 was not dry, with the lessees unable to avail themselves of the "if production ceases" clause because there was never any production, with the lessees keeping their lease alive through November 29, 1947 by the "reworking" clause, but with no finding on the date of termination and no definite evidence of reworking after November 29th, and with no production resulting from the reworking of Well No. 1.

Accordingly the judgments of the trial court and of the Court of Civil Appeals are reversed and judgment is here rendered for petitioners terminating the oil and gas lease on November 29, 1947 without prejudice to such salvage and other rights as lessees may have upon termination. Costs are taxed against respondents.

Opinion delivered April 29, 1953.

## ON REHEARING.

A further consideration on rehearing of the Habendum Clause of this lease has altered my views somewhat. If this lease be kept alive by any of its provisions beyond the five years of the primary term, production of oil or gas obtained from any well while the lease is alive should support the continued life of the lease. However, a majority do not agree and believe that the first well must result in production to support the lease.

Paragraph 2 of the lease is:

"2. Subject to the other provisions herein contained, this lease shall be for a term of five (5) years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land hereunder."

The primary term is "subject to the other provisions herein contained". Since the dominant purpose of a lease is to discover and produce oil and gas, the *as-long-thereafter* clause should apply to the *other provisions* of the lease, including the *reworking* clause. Ryan v. Kent, Texas Com. App. 1931, 36 S.W. 2d 1007; Texas Pacific Coal & Oil Co. v. Bruce, Texas Civ. App., 1921, 233 S.W. 535; Texas Pacific Coal & Oil Co. v. Bratton, Texas Civ. App., 1921, 239 S.W. 688; Scarborough v. New Domain Oil & Gas Co., Texas Civ. App., 1925, 276 S.W. 331; Union Sulphur Co. v. Texas Gulf Sulphur Co., Texas Civ. App., 42 S.W. 2d 182, wr. er. ref. [5] But there cannot be a gap. The support would have to be continuous with no gap.

The parties here have not raised the question of whether or not under the reworking clause the lease terminated at the end of a thirty-day period of no activity. This question was neither briefed nor argued and was not under consideration in our original opinion.

On October 25, 1947 lessors served notice upon lessees that the lease had terminated. By reason of this the lessees claim that they were thereby relieved of any duty to continue further operations ("reworking or otherwise") until the dispute was settled. The rule relied on is in the nature of an estoppel. The cases cited hold that the lessor cannot complain if in the exer-

---

(5) See also. Williams, *Primary Terms and Delay Rental Provisions*, pp. 100-107; Second Annual Institute on Oil & Gas Law & Taxation, Southwestern Legal Foundation; Summers, *Oil and Gas* (Permanent Ed.), § 300, pp. 142-158.

cise of caution and prudence the lessee ceases operations after receiving such a notice. Here lessees did not cease further operations pending settlement of the dispute but in fact redoubled their efforts.

Subject to having changed my views about the meaning of the Habendum Clause, I concur in overruling the motion for rehearing.

Opinion delivered October 28, 1953.

MR. JUSTICE CULVER, joined by JUSTICE GARWOOD, dissenting.

I agree with both the analysis and conclusion reached by the Court of Civil Appeals in its opinion in this case, 250 S. W. 2d. 296, and would affirm that decision. It seems to me that it placed the proper construction upon the word "operations" as used in the latter part of paragraph 5 of the lease contract. In the sense there used I think it should not be restricted to refer solely to the "drilling or reworking operations" in which the lessee was engaged at the expiration of the primary term, but should include additional drilling if prosecuted according to the terms of the contract with no cessation of more than thirty days. The desired result is the production of oil or gas. The lessor is interested only in the prosecution of the work with diligence and it is of little or no consequence to him whether the desired end is accomplished by reworking an old well or the drilling of a new one. I therefore dissent.

Opinion delivered October 28 1953.