STANOLIND OIL AND GAS COMPANY ET AL V. NEWMAN BROTHERS DRILLING COMPANY ET AL

No. A-6164. Decided June 19, 1957.
Rehearing overruled October 1, 1957.
(305 S.W. 2d Series 169.)

---

[2]Texas Rules of Civil Procedure.

490

*Turner, Rodgers, Wynn, Scurlock & Terry* and *George S. Terry,* all of Dallas, for Stanolind Oil and Gas Co., *Bryan, Suhr & Bering* and *D. E. Suhr,* all of Houston, for R. E. Smith, *Warren Sparks* and *Arthur F. Whitt,* for Warren Petroleum Corp., and L. A. Thompson, all of Tulsa, Okla., and *J. K. Smith,* of Fort Worth, for petitioners.

*Dawson Bryant,* of Jayton, *Ratliff, Connor & Walker,* of *Spur, Cox, Patterson & Smith* and *J. Burleson Smith,* all of San Antonio, *Adkins, Folley, McConnell & Hankins,* and *A. J. Folley,* all of Amarillo, for respondents.

MR. JUSTICE WALKER delivered the opinion of the Court.

This is an action to determine the ownership of an undivided one-half of the mineral leasehold estate in 786.33 acres in Kent County. The rights of the parties turn upon the construction and application of the following provisions of two identical oil and gas leases:

"2.   Subject to the other provisions herein contained, this lease shall be for a term of five (5) years from this date (called 'primary term') and as long thereafter as oil, gas or other mineral is produced from said land hereunder."

"  *  *  *  *  *  *  *  *  *  *

"5.   If prior to discovery of oil or gas on said land Lessee should drill a dry hole or holes thereon, or if after discovery of oil or gas production thereof should cease from any cause, this lease shall not terminate if Lessee commences additional drilling or re-working operations within sixty (60) days thereafter or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three months from date of completion of dry hole or cessation of production. If at the expiration of the primary term oil, gas or other mineral is not being produced on said land but Lessee is then engaged in drilling or re-working operations thereon, the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas or other minerals so long thereafter as oil, gas or other mineral is produced from said land.  *  *  *"

On March 23, 1950, the owners of an undivided one-half interest in the minerals under the land executed the two leases in question to H. A. Hedberg. Stanolind Oil and Gas Company, R. E. Smith and Warren Petroleum Corporation, petitioners,

are assignees of Hedberg and claim title under such leases. Newman Brothers Drilling Company and Blanco Oil Corporation, hereinafter referred to as Newman, claim title under leases executed to the former in June and Septembr of 1955 by all of the owners of such undivided one-half mineral interest except Joseph D. Mitchell, Jr. and William Hilseweck, each of whom owns an undivided 20/786.33 mineral interest. The fact that Newman has no lease from Mitchell and Hilseweck is not material here. Stanolind is admittedly the owner of the one-half interest in the leasehold estate which is not involved in this suit.

Respondents, who are Newman and some of the lessors who executed the 1955 leases, brought this suit in two counts against petitioners and the other interested mineral owners. The first count is in trespass to try title to recover the interest in the lease hold estate which Newman owns if the 1955 leases are effective, and by the second count respondents sought a declaratory judgment that the Hedberg leases had expired and are of no further force or effect. Respondents also prayed for an accounting for minerals produced from the land by petitioners, but the accounting issues were severed by agreement and left for future determination. In a trial before the court without the intervention of a jury, the trial court rendered judgment that respondents take nothing, thus holding that the Hedberg leases are in full force and effect. The Court of Civil Appeals reversed the judgment of the trial court and rendered judgment in favor of respondents. 296 S.W. 2d 567. We have concluded that the judgment of the trial court was proper and should be affirmed.

All of the material facts are stipulated by the parties. Each of the Hedberg leases was kept in force during the five-year primary term by the timely payment of annual delay rentals.[1] No drilling operations were commenced on the land prior to March 1, 1955, and there was no production before the primary term expired on March 23rd of that year. Before the end of the primary term, however, Warren Petroleum Corporation and R. E. Smith, two of the petitioners, began drilling a well on the land as the Warren No. 1 Sieber, hereinafter referred to as the Warren well, and prosecuted the drilling of such well continuously until May 3rd, when the same was plugged and abandoned as a dry hole. Forty-five days later Stanolind began drilling a

---

[1] Paragraph 4 of the leases is a conventional "unless" drilling clause, stipulating that if operations for drilling are not commenced within one year the lease shall terminate unless delay rentals are paid as provided therein, and that the commencement of such operations may be further deferred in the same manner for successive periods of twelve months each during the primary term.

second well on the land known as the Stanolind No. 1 Cravey, hereinafter called the Stanolind well, and prosecuted such work continuously until July 26th, when the well was completed as a commercial producer. The Stanolind well did not result from reworking or additional drilling of the Warren well, for the two wells are at entirely different locations. No drilling or reworking operations were conducted on the land between the abandonment of the Warren well on May 3rd and the beginning of the Stnolind well on June 22nd. Oil in commercial quantities has been produced from the Stanolind well from the time of its completion down to and including the present time.

There is no question of innocent purchaser in the case, nor is there any controversy as to the form or manner of execution of the leases. The controlling question is whether the Hedberg leases have expired under their own terms. Since the drilling of the Warren well was in progress at the expiration of the primary term and there was no production at the time, the parties recognize that the leases were kept in force by the second sentence of paragraph 5, hereinafter called the thirty-day clause, at least until such well was plugged and abandoned May 3rd. Petitioners contend that the completion of the first well as a dry hole brought into operation the first sentence of the paragraph, hereinafter referred to as the sixty-day clause, and that this provision was effective to keep the leases alive and give the lessee the right to begin a second well at any time within sixty days. Respondents take the position that the sixty-day clause is a non-forfeiture provision which can be effective only while the lease is in full force and effect, either during the primary term or subsequent to such term when the lease is otherwise extended. They then say that when the thirty-day clause was exhausted by cessation of operations for more than thirty days, the leases automatically terminated and there was nothing left upon which the sixty-day clause could operate.

The precise question was considered and determined adversely to respondents' contentions in St. Louis Royalty Co. v. Continental Oil Co., 5th Cir. 193 F. 2d 778. The lease in that case contained substantially the same provisions as the instruments involved in the present suit, and there was no discovery or production of minerals during the primary term. The first well was begun before, and was abandoned as a dry hole after, the end of such term. A second well, begun more than thirty days but less than sixty days after the first well was abandoned, was completed as a commercial producer. The court concluded that under settled rules of construction, if the plain and simple

language of the sixty-day clause were accorded its ordinary meaning, the lease was kept in force by beginning the second well within sixty days after the completion of the first well as a dry hole.

The opinion discloses, however, that the court was somewhat uncertain as to the proper construction of the provisions of paragraph 5. As an alternative ground for holding that the lease had not terminated, it was said that there was at least some doubt as to its meaning and that the actions and conduct of the parties required a construction preventing forfeiture. This probably had reference to the fact that the plaintiff and its predecessors in title, although fully informed of the lessee's claim to and operations under the lease, did not assert that the same had terminated until some ten years after the end of the primary term, during which time the lessee had developed the property by drilling seven producing wells. Nothing of that character is involved in this suit; petitioners were notified in writing before they began drilling the Stanolind well that Newman was claiming that the Hedberg leases had terminated. The court then went on to say that if the leases had lapsed, the plaintiff was still not entitled to recover because the evidence established as a matter of law that the defendants had perfected a limitation title to the leasehold estate.

■ A careful consideration of the lease provisions convinces us that the construction urged by petitioners and adopted by the Circuit Court is correct. We agree with respondents that the sixty-day clause can be effective only if the lease is in force at the time of the occurrence of the event which renders it operative. It could not revive a lease which had already expired when the dry hole was drilled or when production ceased. This brings us to the crux of respondents' first contention. They recognize that if the leases had been maintained after the end of the primary term by production of minerals, the sixty-day provision would be brought into play by a cessation of such production. But here the leases were kept alive beyond the primary term by operations commenced and prosecuted in accordance with the thirty-day clause. Respondents argue that under our decision in Rogers v. Osborn, 152 Texas 540, 261 S.W. 2d 311, the sixty-day clause and the thirty-day clause must be regarded as separate and distinct provisions referring to different factual situations, not cumulative in application, and that one may not be tacked to the other to extend the lease.

The lease in the Rogers case contained the same provisions

as the instruments now under consideration, but the fact situation was quite different from that involved in the present suit. A well was drilled and gas was discovered in paying quantities during the primary term, but there was no production from such well. The lessee contended that the lease was kept alive beyond the primary term by: (1) reworking operations upon the first well, and (2) the drilling of and production from a second well. Work on the first well had ceased for more than thirty days, and we concluded that the thirty-day clause could not be satisfied by operations on the second well, which was begun after the end of the primary term.

■ It was pointed out in this connection that the conditions of the two sentences should not be jumbled, and that words could not be transposed from one to the other. We also said that *under the facts of that case,* the period of the drilling of and production from the second well could not be tacked to the period of reworking the first well. This was so because neither of the events which made the sixty-day clause operative, i.e. the drilling of a dry hole or the cessation of production, had occurred. We did not say that the two clauses could never be tacked to extend the lease, or that the sixty-day clause would not be effective when the drilling which kept the lease alive under the thirty-day clause resulted in a dry hole. The question involved in the St. Louis Royalty case simply was not reached, and we so stated in the opinion.

In its broadest aspect, the question in this case is by what means and for how long the leases may be kept in force beyond the end of the primary term. If oil or gas had been produced at the end of the five-year period, they would have remained in effect as long as such production continued. Paragraph 2 specifically so provides. But here there was no production at the end of the primary term and for some four months thereafter.

It will be noted that the habendum clause does not merely provide for a term of five years and as long thereafter as production continues. Nor does it purport to make only the primary term subject to the other provisions of the lease. Instead it provides that "subject to the other provisions herein contained, 'this lease shall be for a term of five (5) * * * and as long thereafter as oil, gas or other mineral is produced * * *." The stipulation for a term of five years and as long thereafter as production continues is thus both modified and enlarged by the recital that it is subject to the other lease provisions, and is required

to yield to any and all other provisions which affect the duration of the lease. It is clear then that the lease may be kept in force after the end of the primary term either by production or by the operation of its other provisions.

The thirty-day clause is one of the provisions by which the lease may be maintained beyond the primary term without production. A lessee may have no production at the end of the primary term either because (1) no well has been completed, (2) any or all wells drilled are dry holes, (3) oil or gas has been discovered but not produced, or (4) production has been obtained but has ceased. If the lease has been kept in force for the full primary term, and there is no production but the lessee is engaged in drilling or reworking operation at the end of such term, the thirty-day clause applies and will keep the lease alive as long as the particular drilling or reworking operation is prosecuted with no cessation of more than thirty consecutive days. The primary purpose of this provision is to keep the lease in force as long as the drilling or reworking operation is prosecuted with diligence, and a precise yet quite liberal standard of diligence is laid down. There must be no cessation of the drilling or reworking operation for more than thirty days if the lease is to be kept alive until the operation is completed to production or a dry hole. If the operation is prosecuted with the required diligence and production is obtained, the lease will remain in force as long as production continues.

The thirty-day clause does not tell what will happen to the lease if the particular operation, diligently pursued in accordance with its terms, results in a dry hole. In the absence of some other provision which keeps the lease in force, it would terminate. It will be noted, however, that the thirty-day clause does *not* provide either expressly or by implication that a lease which has been maintained beyond the primary term under its provisions can thereafter be kept in force only by the diligent prosecution of the particular operation begun during such term. This leads to a consideration of the first sentence of paragraph 5.

The sixty-day clause deals only with two fact situations: (1) where a dry hole or holes are drilled prior to the discovery of oil or gas, and (2) where after discovery of oil or gas production ceases from any cause. The sentence provides that in either of the two fact situations, the lease may be kept in force by *additional* drilling or reworking operations begun within sixty days or (if it be within the primary term) by resumption

of payment of delay rentals within a stipulated time. The lessee is specifically given the right to keep the lease alive by resuming payment of rentals in either situation provided it occurs before the end of the primary term. By necessary implication the lease may be kept in force by the additional drilling or reworking operations in either fact situation whether occurring within or after the end of the primary term.

■ Although the clause stipulates that the lease will not terminate, it was not included simply to insure that the drilling of a dry hole or cessation of production would not be grounds for forfeiture of the lessee's estate. If this were its only purpose, it could be effective only at a time when the lease is, and would otherwise remain, in full force and effect under its other provision, i.e. during the primary term. The parenthetical expression shows beyond any question that the parties contemplated that the provision would be effective both during and after such term. Its primary purpose is to give a lessee who has incurred the expense of drilling a well an opportunity to save his lease in the event the well is a dry hole or production ceases after having been obtained. The effect of the provision then, once it becomes operative and lessee begins additional operations within the stipulated time, is to keep the lease alive as long as the additional drilling or reworking operations, and any production resulting therefrom, continue.

There is nothing in the lease to suggest that the sixty-day clause will not be effective if the particular operation begun during the primary term results in a dry hole. Even though the dry hole results from drilling which was going on at the end of the primary term, or there is a cessation of production which kept the lease alive after the end of such term, the parties have agreed that the lease may be kept in force by *additional* drilling or reworking operations begun within sixty days, but *only* in the two fact situations mentioned. The lease was held to terminate in Rogers v. Osborn, supra, because neither of the two fact situations existed which authorized keeping it in force by additional drilling or reworking operations begun within sixty days.

Here the drilling of the Warren well was as effective as production to keep the leases alive until May 3rd. When this well was completed as a dry hole, the leases were in full force and effect and there had been no discovery of oil or gas on the land. The sixty-day clause states unequivocally that under these

circumstances the lease will not terminate if the lessee commences additional drilling or reworking operations within sixty days. Petitioners began drilling the Stanolind well within sixty days and prosecuted such additional operations continuously until production resulted therefrom. There has been continuous production from the latter well. We hold, therefore, that the sixty-day clause became operative when the Warren well was completed as a dry hole, and that the Hedberg leases are in full force and effect under their terms. This does not render either the thirty-day clause or the sixty-day clause meaningless, but gives effect to all of their provisions.

It is argued that this will enable the lessee to maintain the lease indefinitely after the primary term by drilling one dry hole after another, but there is little danger of the lessor's being unduly prejudiced in this manner. We cannot believe that a lessee will continue to spend large sums of money indefinitely to keep a lease in force on apparently unproductive land. Unless production is obtained, therefore, the economic realities of the situation will soon compel the lessee to discontinue operations under the lease.

The judgment of the Court of Civil Appeals is reversed, and the judgment of the trial court is affirmed.

Associate Justices Griffin and Smith dissenting.

Opinion delivered June 19, 1957.

MR. JUSTICE GRIFFIN joined by JUSTICE SMITH, dissenting.

I cannot agree to the construction of the oil and gas lease as set forth in the majority opinion. To construe the lease as a "continuous drilling" contract, under the facts of our case, is, in my opinion, writing into the contract words and meanings not included therein by the parties at the time the contract was executed. A careful analysis of the oil and gas lease here under consideration will not support the result reached by the majority opinion. As I understand the majority opinion, it does away with the last sentence of Paragraph 5 of the lease which requires that if the lease is to remain in force after the expiration of the primary term that "operations are prosecuted *with no cessation of more than thirty consecutive days,*" (emphasis added) and makes the first part of the first sentence all controlling; whereas, the parties, by appropriate language, pro-

vided for three, and only three situations, which would prevent the lapse of the lease. The parties chose adequate language whereby they expressed such intention. It is not necessary to cite any authority for the fundamental principle that the courts, in construing any written instrument, must construe the same so as to carry into effect the intention of the parties as found in the language the parties used. Courts are not at liberty to rewrite the contract made by the parties, nor can the courts add language to that used by the parties and thus change the plain expressed intention of the parties as set out in the contract.

The lease under consideration is what is usually denominated as an "unless" lease. The lease conveys a determinable fee simple estate in the oil and gas in place in, on and under the land described. The primary term set out in Paragraph 2 is for a period of five years from and after March 23, 1950, subject to the other provisions in the lease, and so long thereafter as oil, gas and other minerals are produced from the described land. A failure of the lessee to drill or pay delay rentals within the time limits, as specified in Paragraph 4 (and subject, of course, to the provisions of Paragraph 5) automatically terminates the lessee's estate, and without any action of any kind being taken by the lessor, the lessee's estate reverts to the lessor, their heirs and assigns. W. T. Waggoner Estate v. Sigler Oil Co., 1929, 118 Texas 509, 19 S.W. 2d 27; Stephens Co. v. Mid-Kansas Oil & Gas Co., 1923. 113 Texas 160, 254 S.W. 290, 29 A.L.R. 566; Texas Company v. Nelson Davis, 1923, 113 Texas 321, 255 S.W. 601; Watson v. Rochmill, 137 Texas 565, 155 S.W. 2d 783, 137 A.L.R. 1032; Guerra v. Chancellor, Texas Civ. App., 1937, 103 S.W. 2d 775, wr. ref.

"* * * Generally the parties to an instrument intend every clause to have some effect and in some measure to evidence their agreement, and this purpose should not be thwarted except in the plainest case of necessary repugnance. Even where different parts of the instrument appear to be contradictory and inconsistent with each other, the court will, if possible, harmonize the parts and construe the instrument in such way that all parts may stand and will not strike down any portion unless there is an irreconcilable conflict wherein one part of the instrument destroys in effect another part. Associate Oil Co. v. Hart, Texas Com. App., 277 S.W. 1043; Benge v. Scharbauer, 152 Texas 447, 259 S.W. 2d 166, and cases cited therein." Woods v. Sims, 1954, 154 Texas 59, 273 S.W. 2d 617, 620.

See also J. K. Hughes Oil Co. v. Mayflower Inv. Co., 1946,

Texas Civ. App., 193 S.W. 2d 971, wr. ref.; Williams v. J. & C. Royalty Co., 1953, Texas Civ. App., 254 S.W. 2d 178, wr. ref.; Brown v. Brown, 1951, Texas Civ. App., 245 S.W. 2d 995, wr. ref.; 14-B Texas Jur. 588, Sec. 136.

And further:

"* * * It appears to be the settled rule in this state that of two or more equally reasonable constructions of which the language of an oil and gas lease is susceptible the one more favorable to the lessor will be allowed to prevail. * * *" Zeppa v. Houston Oil Co. of Texas, 1938, Texas Civ. App., 113 S.W. 2d 612, ref.

Also Aycock v. Reliance Oil Co., 1919, Texas Civ. App., 210 S.W. 848, no writ history; Hitson v. Gilman, 1920, Texas Civ. App., 220 S.W. 140, 144, no writ history.

Bearing in mind the foregoing rules of law, let us examine the lease in question. Paragraph 5 is the only provision of the lease that is relied upon by petitioners to support their contention that the lease on respondents' mineral interest did not lapse, but authorized the drilling of the Stanolind No. 1 Cravey well and that its completion as a producer extended the lease as to respondents' mineral interest. As I see it, the parties provided for three separate and distinct situations. *First,* "if prior to discovery of oil or gas on said land Lessee should drill a dry hole or holes thereon;" or *Second,* "if after the discovery of oil or gas the production thereof should cease from any cause *this lease shall not terminate*" (emphasis added) if (a) "Lessee commences additional drilling or re-working operations within sixty (60) days thereafter;" or (b) "if it be within the primary term commences or resumes the payment or tender of [delay] rentals * * *" as therein set out in detail; and *Third,* "if at the expiration of the primary term oil, gas or other mineral is not being produced on said land but Lessee is then engaged in drilling or re-working operations thereon, *the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days,*" (emphasis added) and and if production results from such operations the lease to remain in force thereafter as long as production continues from said land.

Of necessity the drilling of a dry hole or holes provided for in "First" above must be drilled during the primary term. This

must follow because if there is no production of oil or gas during the primary term, the lease can only be kept alive during the primary term by (a) payment of delay rentals, or (b) by drilling. If there is production of oil or gas during the primary term and at the time the dry hole or holes are drilled, the lease is kept alive by such production as specifically provided in Paragraph 2, and no additional drilling is necessary, nor does it prevent termination of the lease. Omitting, of course, consideration of the implied obligation to reasonably develop the land, failure to carry out this obligation has been held not to terminate the lease. W. T. Waggoner Estate v. Sigler Oil Co., supra. The part of Paragraph 5 which I have set out as "First" can be applied only where there has been no discovery of oil or gas. Such language does not apply if there has been discovery of oil and gas and production has ceased whether within or without the primary term because clause "Second" controls. If oil or gas has been discovered during the primary term and production should cease from any cause, lessee has two options to keep the lease in force: (1) to commence additional or re-working operations within sixty (60) days thereafter; i.e., after production has ceased, regardless of the number of dry holes drilled prior to the cessation of production; or (2) to resume payment of delay rentals as set out in this paragraph if within the primary term. It is not the drilling of dry holes where production is had during the primary term which gives the lessee the right or fixes the time within which lessee must resume drilling, or pay rentals, if appropriate. The time within which lessee must resume drilling in order to hold the lease—if he seeks to hold it by drilling—begins to run with cessation of production, whether during or after the expiration of the primary term. "Primary term" is expressly limited by Paragraph 2 to the term of five years. Thus, we see that "First" provision of Paragraph 5 has no application to "Second" and is no part thereof. By the same token, I say it is not applicable to "Third." If there is no discovery of oil or gas at the end of the primary term, but lessee has drilled a dry hole or holes within the primary term, then lessee, to keep the lease from terminating, must "commence additional drilling or re-working operations within sixty (60 days thereafter;" i.e., sixty days from the completion of the dry hole. In that situation there could be no cessation of production. In the case at bar, petitioners did not commence additional drilling operations until 90 days after the expiration of the primary term. No dry holes had been drilled at the expiration of the primary term. Under the facts of our case, I have shown that the dry hole clause cannot possibly be used by petitioners to keep alive or prevent the termination of the lease on respondent's min-

eral interest. That part of Paragraph 5 which I have denominated "Second" cannot be used by petitioners to keep the lease alive for the reason there was no discovery of oil or gas prior to the commencing of drilling on Stanolind No. 1 Cravey; therefore, productio ncould not "cease from any cause" as must be the case in order to make effective that part of Paragraph 5 which I call "Second."

Having demonstrated that none of the facts necessary to keep the lease alive in accordance with the plain provisions of "First" and "Second" of the lease exist, I will next analyze the last sentence in Paragraph 5 to determine if that sentence did keep the lease alive. This sentence is the "Third" situation provided for by the parties at the time they executed the lease, and is as follows: "* * * If at the expiration of the primary term oil, *gas or other mineral* is not being produced on said land but Lessee is then engaged in drilling or re-working operations thereon, the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas *or other mineral* so long thereafter as oil, gas or other mineral is produced from said land * * *." (Emphasis added).

As required by the first part of "Third," oil or gas or other mineral was not being produced from the land at the expiration of the primary term. Lessee was engaged in drilling Warren Sieber No. 1 at the expiration of the primary term; therefore, this case fits this part of "Third" subdivision perfectly. Neither "First" or "Second" fit because no facts are present which will bring either "First" or "Second" into effect. Those two cover entirely separate and distinct sets of facts from those in this case. The parties in drawing the lease evidently foresaw just such a situation as this at the end of the primary term, and wrote "Third" into their lease. As stated in Woods v. Sims, supra, the parties intended for every clause in Paragraph 5 to have some effect and to evidence their agreement. The courts should construe "Third" to mean just what it says. How long does this "Third" clause provide that the lease shall last, if the facts requisite to its application are present? It plainly and clearly states, "* * * the lease shall *remain in force so long* (emphasis added) as operations are prosecuted with no cessation of more than thirty (30) consecutive days * * *," and if "they" (i.e., those operations being carried on at the end of the primary term) result in production of oil, gas or other mineral thereafter so long as such production continues. It must be the

operations—whether drilling or re-working—that are being carried on at the end of the primary term which result in production to keep the lease in force "so long thereafter" as production continues. In the face of the language used, it cannot be other or additional "drilling or re-working" operations. The word "they" is the plural pronoun, and refers to both of the next preceding situations, viz.: Lessee engaged in (1) drilling or (2) re-working operations. It could not possibly refer back to "First" or "Second" so as to include "drilling of a dry hole or holes" or "cessation of production." Further, it refers to such operations as "are prosecuted with no cessation of more than thirty (30) consecutive days." We must remember that 49 days expired between abandonment of Warren Sieber Well No. 1 on May 3, 1955 and the commencement of drilling on Stanolind No. 1 Cravey on June 22, 1955. There is not one word about additional drilling keeping the lease alive after cessation of operations for thirty consecutive days. In the "First" and "Second" clauses of Paragraph 5 the parties provided for additional drilling or re-working operations commenced within sixty days thereafter — either a dry hole or cessation of production. The instrument clearly demonstrates that the parties knew how to provide for additional drilling or re-working operations and they did so provide in "First" and "Second" clauses. The fact that they did not so provide in "Third" clause proves to me that they did not intend for such additional drilling operations to be applicable to "Third" situation.

The three provisions are separate and distinct. A reading of Paragraph 5 shows that each is separate from the other and each covers an entirely different set of facts. It will be noted that "Third" has its own provision covering the situation where oil, gas, or other mineral is not being produced. If the parties had intended the three clauses to be mutually supplementary to each other, it would not have been necessary to include anything in "Third" clause about oil, gas and other mineral not being produced at the end of the primary term. The very first sentence in Paragraph 5 "if prior to the discovery of oil or gas on said land" and "production thereof should cease for any cause" would have adequately covered the situation where lessee was engaged in drilling or re-working operations at the end of the primary term. But there are other differences in language used in "First" and "Second" clauses with that used in "Third." "First" and "Second" provide for *"commences additional drilling or re-working operations;"* (emphasis added) ; "Third" provides if "lessee is then engaged in *drilling or re-working operations."* (Emphasis added). Re-working has a different and dis-

tinct meaning from working. Working includes many operations, and is not necessarily confined to a well in the process of being drilled; or a well from which production has ceased from any cause. In fact, it does not necessarily mean a well must be in existence—it includes preliminary steps taken to drill a well. Re-working means working again, and implies that work has already been done. There must be a well in existence that has been "worked," or is in the process of being drilled, before it can be "re-worked." Thus, "Third" applies to the well drilling at the end of the primary term, or a well from which production had ceased at the end of the primary term, and which well is being re-worked and cannot apply to a new, separate and distinct well. "First" and "Second" provide "this lease *shall not terminate* * * *." (Emphasis added). "Third" provides "this lease shall remain in force so long as * * *." "First" and "Second" have no provision that the "additional drilling or re-working operations" must be prosecuted with any required diligence. "Third" requires that the "drilling and re-working operations" are to be prosecuted with no cessation of more than thirty consecutive days. This difference is accounted for by the fact that "Third" provides for an extension of the primary term and more diligence is required of lessee in order to secure the extension. As said in Garcia v. King, 139 Texas 578, 164 S.W. 2d 509, 512:

"The object of the contract was to secure development of the property for the mutual benefit of the parties. It was contemplated that this would be done during the primary period of the contract. * * * The lessors should not be required to suffer a continuation of the lease after the expiration of the primary period merely for speculation purposes on the part of the lessees * * *."

"First" and "Second" deal only with "oil or gas" and "Third" cover "oil, gas or *other mineral*." (Emphasis added).

The differences in language between "First," "Second" and "Third" emphasize and show correct my contention that they each cover separate and distinct situations, and none can be tacked onto the other. The construction in the majority opinion of Paragraph 5 sets aside and renders of no avail the express language of "Third" as to the time the lease shall remain in force. Also it reads into and adds to "Third" the words "commences additional drilling or re-working operations within sixty days thereafter." "Third" contains no "dry hole" provision that will extend the lease, but the majority opinion trans-

poses such a provision out of "First" and "Second" to "Third" so as to extend the lease. The express language of "Third" limits the time the lease shall remain in force to such time and only such time "as operations are prosecuted with no cessation of more than thirty (30) consecutive days." The majority opinion extends this time to sixty days.

"If a deed contains both general and specific provisions relating to the same matter, it seems clear that the intention of the grantor can only be ascertained by reading the more general expressions in the light of the restrictive or more specific terms. The usual presumption is that the specific words were added for greater certainty, and to explain the preceding part. This principle of construction, however, is limited by the rule that effect must be given to the instrument as a whole if a definite meaning can be extracted that will give due weight to the text of both clauses." 14-B Texas Jur. 588, Deeds, Sec. 138.

My construction gives effect to the whole instrument executed by the parties and does not set aside either "First," "Second," or "Third," but harmonizes and give due weight to all.

We must keep in mind that Stanolind No. 1 Cravey was not begun until 49 days after Warren Sieber No. 1 was abandoned as a dry hole and "drilling or re-working" operations had ceased for a period of 49 days. Petitioners cannot avail themselves of the sixty day provisions of "First" or "Second" because they had drilled no dry hole or holes at the expiration of the primary term. Neither can they avail themselves of "Third" because "drilling or re-working operations" had ceased for more than thirty consecutive days prior to commencing operations on Stanolind No. 1 Cravey. My construction is in harmony with this Court's holding in the recent case of Rogers v. Osborn, 1953, 152 Texas 540, 261 S.W. 2d 311, 314. At the very beginning of our opinion in that case wherein we answered the "Second" question "No," we unequivocally held that the drilling of and production from a second well commenced after the expiration of the primary term would not keep the lease alive. We further said in clear and unmistakable language and applicable to our present situation:

"Lessees were upon notice when they drilled Well No. 2 that lessors then contended the lease had terminated. Under the facts of this case the lessees cannot tack the period of the drilling of and production from Well No. 2 to the period of re-working Well No. 1. In order to do that the lessees would have

to borrow the words *commences additional drilling* from the first sentence of paragraph 5 and transpose them to the second sentence. The conditions contained in the two separate sentences should not be jumbled. The first two sentences apply to different factual situations. Since the first provides for 'additional drilling' and the second does not, we hold that the second *operates* as used in the second sentence does not include additional wells commenced after the expiration of the primary term. * * *"

On rehearing the justice writing the opinion said: "* * * However, a majority do not agree and believe that the first well must result in production to support the lease. * * *" Even the dissenters believed the drilling should begin within the thirty day period for they said, "* * * In the sense there used I think it should not be restricted to refer solely to the 'drilling or reworking operations' in which the lessee was engaged at the expiration of the primary term, but should include additional drilling if prosecuted according to the terms of the contract *with no cessation of more than thirty days.* * * *" (Emphasis added). Also the dissent agreed with both the analysis and conclusions reached by the Court of Civil Appeals in its opinion in 250 S.W. 2d 296, 298, and would affirm that decision. The Court of Civil Appeals, after quoting the first part of "Third" (the thirty day clause), said:

"* * * Under this clause, the lessee may keep the lease in force after the primary term by conducting continuous drilling or reworking operations on the land *with no cessation of more than thirty consecutive days,* providing, of course, drilling or re-working operations were being prosecuted at the termination of the primary term. The drilling of Clopton No. 2 was a drilling operation upon the land. *The question then is whether or not continuous drilling or re-working operations (with no more than 30 days cessation)* were prosecuted upon the land covered by the lease from the termination of the primary term to the commencement of drilling operations upon Clopton No. 2d * * *" (Emphasis added).

Thus we see that the Court of Civil Appeals held that to keep the lease alive there must be no cessation in activities of more than 30 days. In our case it was stipulated that there was a cessation of 49 days from the time the Warren Sieber No. 1 well was abandoned and the time Stanolind No. 1 Cravey was commenced. So even under the Court of Civil Appeals' decision in the Osborn case and under the dissent our lease was not kept

alive because "drilling or re-working operations on said land" were not "prosecuted with no cessation of more than thirty (30) consecutive days."

The Osborn case is clearly authority for the proposition that only production from the well being "drilled or re-worked" at the end of the primary term will suffice to keep the lease alive. The error in the reasoning of the majority that the completion of the Warren Sieber No. 1 as a dry hole extends the lease for sixty days in which additional drilling may be commenced is that such reasoning sets aside and nullifies that part of the thirty day clause which says, "* * * the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days." This plain language of the lease the majority ignores, but transposes language from "First" and "Second" clauses. These clauses on their face show they cover an entirely separate and distinct situation from our case and they make no attempt to provide for a situation wherein lessee is engaged in drilling at the expiration of the primary term. *If the first part of "Third" is sufficient to extend the lease past the primary term, why is not the limitation of the life of the lease contained in the last part to be given equal effect?* I can conceive of no good reason, legal or equitable, for using part of "Third" and refusing to use all of "Third."

Petitioners rely upon the case of St. Louis Royalty Co. v. Continental Oil Co., 193 F. 2d 778 (5th Cir. 1952) ; 1 Oil & Gas. Rep. 538. The holding by that court that the sixty day clause was sufficient was only one of other alternative holding in order to sustain judgment for the oil company. Plaintiffs in that case sat idly by and accepted their pro-rata part of the production for more than ten years and also permitted the oil company to spend large sums of money in drilling and "bringing in" and producing seven wells on the land. The Court said the equities were such that a court of equity should strain against granting the relief sought because "to do so would result in plaintiffs' unjust enrichment." In our case the oil company began the drilling of Stanolind No. 1 Cravey with full knowledge, and after notice of, the claim on the part of respondents that the lease had lapsed. Further, the oil company, by virtue of its ownership of a valid leasehold covering one-half of the mineral interest, had a co-tenant's right to drill Stanolind No. 1 Cravey. In addition, the court based its holding upon the undisputed facts of that case and stated that such facts established "as a matter of law, that every element of the adverse possession required under the five year statute of limita-

tion was present in this case and that the defendants were entitled to judgment on the basis of the superior title thus acquired. * * *" I believe that the St. Louis Royalty case incorrectly decides the effect of Paragraph 5 of the lease, and I would not follow it. In support of my contention see the cases of Skelly Oil Co. v. Wickham, 202 F. 2d 442 (10th Cir. Okla.), 2 Oil & Gas Rep. 559. This is a later case than the St. Louis Royalty Co. case. Also the case of Producers Oil & Gas Co., Inc. v. Continental Securities Corp., 188 La. 564, 177 So. 668 (1937).

I would affirm the judgment of the Court of Civil Appeals in this case.

Associate Justice Smith joins in this dissent.

Opinion delivered June 19, 1957.

Rehearing overruled October 2, 1957.