# IN THE SUPREME COURT OF TEXAS

No. 18-1187

ENDEAVOR ENERGY RESOURCES, L.P., PETITIONER,

v.

ENERGEN RESOURCES CORPORATION, ET AL., RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE ELEVENTH DISTRICT OF TEXAS

**Argued September 16, 2020**

JUSTICE BLACKLOCK delivered the opinion of the Court.

The parties dispute the meaning of an oil and gas lease covering an 11,300-acre tract in Howard County. The lease allows the petitioner, Endeavor Energy Resources, L.P., to retain its leasehold interest in the entire parcel only by drilling a new well every 150 days, except that Endeavor can "accumulate unused days in any 150-day term . . . in order to extend the next allowed 150-day term between the completion of one well and the drilling of a subsequent well." Failure to keep this drilling schedule will result in termination of the lease as to those portions of the property without a producing well. The issue on appeal is how to calculate the number of "unused days." Endeavor argues that the agreement allows it to carry forward unused days across multiple 150-day terms. In the alternative, Endeavor contends the lease is at least ambiguous on this point such that the disputed language may not operate as a special limitation. Respondents Energen

Resources Corporation and John Quinn, on the other hand, argue that the contested provision unambiguously allows unused days earned in any given term to be carried forward only once, to the next 150-day term. The trial court granted summary judgment for Energen and Quinn, and the court of appeals affirmed. Because we conclude that the provision at issue is ambiguous, we reverse the judgment of the court of appeals, render judgment for Endeavor on the title issue, and remand to the trial court for consideration of remaining issues.

## I. Background

In 2006, Respondent John Quinn, as lessor, entered into an oil and gas lease ("Lease") with OGX Resources LLC covering an 11,302.98-acre tract in Howard County. OGX later conveyed its interest as lessee to Endeavor. The Lease created a three-year primary term, followed by a secondary term that would continue "as long thereafter as oil and gas, or either of them is produced in paying quantities," subject to other provisions of the Lease. One such provision was a "continuous-development" clause, which allows the lessee to retain its interest in the entire tract during the secondary term only by complying with the required drilling schedule. Otherwise, the Lease would terminate as to all "non-dedicated acreage" (acreage not located within a proration unit containing a producing well). The relevant portion of the Lease reads as follows:

> (c) This lease shall terminate as to all non-dedicated acreage any time a subsequent well is not commenced within one hundred fifty (150) days from the completion of a preceding well. Each well herein provided to be drilled, once spudded, shall thereafter be drilled with reasonable and continuous diligence to a depth below three thousand five hundred one feet (3,501') below the surface and shall be deemed to be completed ten (10) days after the drilling rig moves off the hole or upon removal of the completion rig, whichever is sooner. **Lessee shall have the right to accumulate unused days in any 150-day term during the continuous development program in order to extend the next allowed 150-day term between the completion of one well and the drilling of a subsequent well.**

2

(emphasis in original). Following the primary term's expiration on July 21, 2009, Endeavor timely began drilling wells, which extended the Lease into the secondary term. Endeavor drilled the first twelve wells without controversy.

On November 2, 2015, after 310 days had elapsed without Endeavor commencing a thirteenth well, Quinn re-leased the non-dedicated acreage to Energen. Energen sued Endeavor two days later. On November 12, 320 days after completing its twelfth well, Endeavor began drilling a thirteenth well. Energen, with the support of Quinn as intervenor, argued that Endeavor's leasehold terminated due to excessive delay in beginning the thirteenth well. Energen construed the Lease's continuous-development provision as allowing unused days from any given 150-day term to be carried over only to the immediately following term, thus obligating Endeavor to begin its thirteenth well by July 1, 2015—186 days after completion of the twelfth well (150 days plus 36 unused days from the preceding term). Endeavor, on the other hand, argued that the provision allows the lessee to accumulate unused days across multiple terms. Under Endeavor's reading, because many of its earlier wells had been drilled in advance of their deadline, Endeavor had accumulated 377 days to begin the thirteenth well. In the alternative, Endeavor argued that the provision cannot operate as a special limitation because it is ambiguous as to whether Endeavor may accumulate unused days across multiple terms. Endeavor also filed a counterclaim against Energen for tortious interference with contract. Both sides moved for partial summary judgment on the Lease-construction issue.

The trial court sided with Energen, holding that, because Endeavor did not begin drilling within the 186-day window, its interest in non-dedicated acreage reverted to Quinn, who in turn validly re-leased that acreage to Energen. Based on this conclusion, the trial court granted

3

Energen's motion for summary judgment against Endeavor on the latter's tortious-interference claim, as well. Energen then filed a supplemental petition asserting claims of trespass and conversion against Endeavor, both of which the parties resolved by stipulation shortly thereafter. The trial court issued a final judgment in favor of Energen. The court of appeals affirmed. 563 S.W.3d 449 (Tex. App.—Eastland 2018). We granted Endeavor's petition for review.

## II. Discussion

### A. Standard of Review & Principles of Interpretation

"[W]e review lease-construction questions *de novo*." *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). An oil and gas lease is a contract, so its construction is governed by "general principles that govern . . . construction of contracts." *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018). The most important consideration in interpreting a lease is the agreement's plain, grammatical language. *Anadarko*, 94 S.W.3d at 554. A court's task "is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018). In doing so, we "examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent." *Anadarko*, 94 S.W.3d at 554.

At the same time, the objective meaning words convey often depends upon the "objectively determinable facts and circumstances" that would influence how a reasonable reader would understand the language. *URI*, 543 S.W.3d at 757–58. We therefore read contracts "'from a utilitarian standpoint bearing in mind the particular business activity sought to be served,' and avoiding unreasonable constructions when possible and proper." *Plains Expl. & Prod. Co. v.*

4

*Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).  To that end, when contractual text alone is inconclusive, courts may "consider the facts and circumstances surrounding [the] contract, including 'the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction.'" *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (quoting *Americo Life, Inc. v. Myer,* 440 S.W.3d 18, 22 (Tex. 2014)).  The ultimate goal, however, is always to determine the parties' intent as objectively expressed in the words of their agreement.  Although consideration of surrounding circumstances is sometimes helpful in understanding the words chosen by the parties, such extrinsic evidence cannot justify interpreting contractual "language [to] say what it unambiguously does not say." *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017).

If, even after applying all "pertinent construction principles," a contract's language remains susceptible "to two or more reasonable interpretations," then the agreement is ambiguous as a matter of law. *Plains Expl. & Prod. Co.*, 473 S.W.3d at 305.  In most instances, an ambiguous contract's meaning must be determined by a finder of fact, who may consider evidence of the parties' subjective intent. *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996).  Because oil and gas leases "transfer and affect title to real-property interests, however, they are subject to special construction rules that apply particularly to agreements governing property rights." *Discovery Operating*, 554 S.W.3d at 595.  One such rule is that contractual language will not be held to automatically terminate the leasehold estate unless that "language . . . can be given no other reasonable construction than one which works such result." *Knight v. Chicago Corp.*, 188 S.W.2d 564, 566 (Tex. 1945).  We recently reaffirmed this principle:

5

"Although whether a lease has terminated is always a question of resolving the intention of the parties from the entire instrument, we will not find a special limitation 'unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning.'"[1] *Discovery Operating*, 554 S.W.3d at 606 (quoting *Anadarko*, 94 S.W.3d at 554); *see also Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966) (citing *Knight*, 188 S.W.2d at 566) ("Another sound rule of interpretation is that language used by the parties to an oil and gas lease will not be held to impose a special limitation on the grant unless it is clear and precise and so unequivocal in nature that it can reasonably be given no other meaning.").

We have been increasingly hesitant to fall back on such "default" rules of contract construction, preferring instead to resolve questions of contractual meaning based on objective textual indicators of the parties' intent, if at all possible. *See Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 744 (Tex. 2020); *Discovery Operating*, 554 S.W.3d at 606–07 (invoking the rule that special limitations must be "clear, precise, and unequivocal" but concluding that the "plain, grammatical language" of the leases satisfied that standard). Nevertheless, when all available means of interpreting the lease are exhausted and the disputed provision remains equally susceptible to multiple reasonable readings, the ambiguity will be resolved against imposition of a special limitation. *See Knight*, 188 S.W.2d at 566 (citing *Decker v. Kirlicks*, 216 S.W. 385 (Tex. 1919)); *W.T. Waggoner Estate v. Sigler Oil Co.*, 19 S.W.2d 27, 31 (Tex. 1929); *York v. McBee*, 308 S.W.2d 951, 956 (Tex. Civ. App.—Waco 1957, writ ref'd n.r.e.).

---

[1] The parties agree that the disputed provision is properly characterized as a special limitation. "A special limitation in an oil and gas lease" refers to a contractual term that "provides that the lease will automatically terminate upon the happening of a stipulated event." *Discovery Operating*, 554 S.W.3d at 606.

6

## B. Parsing the Operative Text

We begin with the most important consideration in interpreting any contract: "the plain meaning of the [agreement's] operative language." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 121 (Tex. 2015). The parties dispute the meaning of a single sentence of the Lease, which reads, "Lessee shall have the right to accumulate unused days in any 150-day term during the continuous development program in order to extend the next allowed 150-day term between the completion of one well and the drilling of a subsequent well."[2]

Endeavor argues that the contested sentence allows it to accumulate a bank of unused days across multiple terms. Under this reading, if Endeavor begins drilling a well less than 150 days after completing the previous well, the unused days roll over and "extend" the "next" term. Then, if any days in that "extend[ed]" term are not used, all those unused days roll over into the "next" term after that, and so on. Energen, on the other hand, reads the sentence as permitting unused days earned in a given term to extend only the immediately following term. In Energen's view, unused days in an extended term do not all carry over to the following term. Instead, only if Endeavor uses less than 150 days in a term do any unused days carry forward to the next term. Energen emphasizes that the "right to accumulate unused days in any 150-day term . . . in order to extend the next allowed 150-day term," distinctly refers to "any . . . term" as singular rather than plural. This, Energen contends, indicates that unused days from multiple terms cannot be combined for purposes of extending the succeeding term. Likewise, the Lease provides that unused days from any one term roll over only to the "next . . . term"—again, singular—which,

---

[2] This sentence, unlike those surrounding it, was bolded in the original Lease, suggesting that the drafting parties recognized its significance at the time of the Lease's execution.

according to Energen, means that unused days extend only to the immediately following term and cannot roll over into later terms.

A hypothetical example may serve to better explain the parties' dispute. Suppose Endeavor uses only 60 days to complete Well A. The parties agree that 90 days carry over to the "next" term, so Endeavor has 240 days to commence drilling Well B. Now suppose Endeavor commences Well B after 210 days. How many days does Endeavor have to commence drilling Well C? Here the parties diverge. In Endeavor's view, because it used only 210 out of 240 available days for Well B, it carries forward 30 "unused days" into the "next" term, which means it has 180 days to commence drilling Well C. As Energen sees it, however, any days accumulated due to the early drilling of Well A cannot be carried forward again into the term for Well C. This is so, Energen argues, because Well C is not the "next" term relative to Well A. Under this view, the term for Well C is only extended if Endeavor uses less than 150 days in the immediately preceding term to commence Well B. Under this reading, because Endeavor took 210 days to commence Well B, no unused days would carry forward into the third term and Endeavor would have 150 days to commence Well C.

The parties advance several competing arguments for their preferred reading of the text. They focus much attention on the contested sentence's repeated use of the phrase "150-day term." The lessee has "the right to accumulate unused days in any *150-day term . . .* in order to extend the next allowed *150-day term*" (emphases added). Endeavor argues that the label "150-day term" must be understood as a generic label used to describe both extended and unextended terms. After all, under both parties' readings, unused days may be carried forward at least once, resulting in a "next allowed 150-day term" that is actually longer than 150 days. Endeavor also points out that

8

the "150-day term" from which unused days can accumulate may actually be longer than 150 days if it has been extended by unused days in the previous term. As Endeavor sees it, once unused days start accumulating, the "150-day term" to which the provision repeatedly refers is rarely exactly 150 days, and neither party truly reads the words "150-day term" to always refer only to terms of exactly that length. Further, the clause says that unused days carried forward to the "next" term operate to "extend" that term. Any unused days from such an "extend[ed]" term, Endeavor contends, may be carried forward into the "next," succeeding term.

Energen advances an alternative understanding of the phrase "150-day term." Energen's position, which the court of appeals adopted, *see* 563 S.W.3d at 456, is that the contested sentence refers to both extended and non-extended terms using the same "150-day" label in order to convey that every term (extended or not) is 150 days long for purposes of calculating how many unused days have been generated. The sentence's plain meaning, Energen explains, is that the lessee "may not . . . 'accumulate unused days' from a term after its 150th day, or use 'unused days' to extend anything other than a '150-day term.'" Respondent's Brief at 45. Said otherwise, Energen reads "150-day term" as denoting every term's "default" duration—the length of the period "from which days may be 'accumulated' and to which unused days may be added." *Id*. This reading does *not* permit banking unused days from multiple terms.

Neither party advances the strictly literal reading, under which "150-day term" refers only to terms of exactly 150 days. Under this third possible reading, the statement that "[l]essee shall have the right to accumulate unused days in any 150-day term" means that only un-extended terms of 150 days are capable of generating unused days. For instance, if Endeavor had 150 days in Term 1 and used only 140, ten unused days would be carried over into Term 2. But, because Term

9

2 would then be 160 days long, it would no longer qualify as "any 150-day term." As a result, no days could accumulate from it. This reading, as Endeavor observes, would created a "bizarre alternating pattern of extendable and non-extendable terms . . . bereft of discernible purpose." Petitioner's Brief at 20.

Like both parties, we decline to interpret the contested sentence in this hyper-literal fashion. We find it significant, however, that neither party wants the words "150-day term" to always mean precisely what they say. Because both sides seek to avoid the consequences of the most literal reading of the text, both sides struggle to demonstrate the textual superiority of their positions, instead relying primarily on explanations for how the disputed words can be interpreted consistently with the desired outcome. This is understandable given both sides' aversion to the provision's most literal reading, but it does little to help us determine the words' objective meaning. All things considered, between Endeavor's position (that "150-day term" is a generic label referring to terms of exactly 150 days and to extended terms) and Energen's position (that "150-day term" dictates the way unused days are calculated but does not always accurately describe the length of any given term), we cannot reject either as unreasonable based on the Lease's operative text alone.

We next consider the textual line of argument that formed the primary basis for the court of appeals' holding. *See* 563 S.W.3d at 455. The Lease, in giving Endeavor "the right to accumulate unused days in any 150-day term . . . in order to extend the next allowed 150-day term," distinctly refers to "any . . . term" as singular rather than plural in describing the period in which unused days may be accumulated. This, Energen contends, indicates that unused days can only come from the one immediately preceding term, not from multiple preceding terms flowing

10

forward indefinitely. Likewise, Energen argues that unused days from any one term roll over only to the singular "next . . . term," meaning the term immediately following that in which the unused days were accumulated.

As sound as Energen's arguments to this effect initially seem, Endeavor offers a forceful rebuttal. It points out that Energen's focus on the word "next" merely begs the question of whether unused days carried over from one term to the next become part of the latter term. If they do, as Endeavor contends, then such unused days may be carried forward across multiple terms indefinitely because there will always be a "next" term into which unused days from the immediately preceding, extended term may roll over. Endeavor observes that the Lease describes unused days as "extend[ing]" the next term, which suggests the next term becomes a term of more than 150 days—not, as Energen contends, a new term of 150 days followed by "use-them-or-lose-them" extension days. In the end, the inquiry comes back to whether the "any 150-day term" from which unused days may accumulate includes extended terms or requires calculation of unused days based on a 150-day term even if that term has been extended. We have already determined that this question is too close to call based on the Lease's text. In our view, neither the parties' use of "any . . . term" and "next . . . term" as singular rather than plural, nor their use of the word "next," decisively support Energen's interpretation of the contested sentence.

Another textual point of contention between the parties concerns the word "accumulate." Endeavor argues that the lessee's "right to *accumulate*" unused days connotes a right to stack up or compile an accumulation of days over multiple periods. As Endeavor sees it, if days can only be accrued once and then are lost if not used, no "accumulating" takes place. Endeavor contends

"it would strain the concept of accumulation beyond the breaking point to say that a one-time accrual of something can constitute an accumulation." Petitioner's Brief at 13.

Although the parties' use of the verb "accumulate" to describe the accrual of unused days provides some support for Endeavor's position, we agree with Energen that Endeavor places outsized emphasis on the word. "Accumulate" often refers, of course, to gradual building up over time, as Endeavor suggests.[3] But it is also often used to describe increases in general, whether gradual, sudden, incremental, or otherwise.[4] The context in which the Lease uses "accumulate" does not indicate that the word must bear one of these meanings to the exclusion of the other. While the word often connotes a gradual build up over time, it does not always mean only that, and it is unlikely the parties intended to indirectly divulge their true meaning merely by choosing the word "accumulate." "Without some indication to the contrary, general words (like all words . . . ) are to be accorded their full and fair scope [and] are not to be arbitrarily limited." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 101 (2012). Endeavor's restrictive, outcome-determinative view of the word "accumulate" places more importance on that word than it can reasonably bear. *See, e.g.*, *Source, Inc. v. Am. Exp. Co.*, No. 2-05-CV-364, 2007 WL 2727137, at *9 (E.D. Tex. Sept. 14, 2007) (rejecting argument in patent-

---

[3] *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 13 (1961) ("[A]ccumulate suggests a gradual piling up or increasing so as to make a store or great quantity."); CAMBRIDGE ADVANCED LEARNER'S DICTIONARY (4th ed. 2013) ("to collect a large number of things over a long period of time"); CAMBRIDGE ACADEMIC CONTENT DICTIONARY (2017) ("to collect or increase something gradually, esp. over a period of time").

[4] *See* BRYAN A. GARNER, DICTIONARY OF MODERN LEGAL USAGE 11–12 (1987) ("to pile up; collect," or "increase"); AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2016) ("To gather or cause to increase; amass"); AMERICAN HERITAGE ROGET'S THESAURUS (2013) ("To bring together so as to increase in mass or number"); COLLINS ENGLISH DICTIONARY (12th ed. 2014) ("to gather or become gathered together in an increasing quantity; amass; collect"); OXFORD AMERICAN DESK DICTIONARY & THESAURUS 7 (3d ed. 2010) ("gather together a number or quantity of," or "increase").

construction case that "'accumulating' must be done 'gradually,'" instead holding that "the term 'accumulate'" broadly means "'to increase in quantity or number.'").

### C. Other Indicators of Meaning

Our analysis of the Lease's operative text is inconclusive. Although the sentence might therefore be characterized as "ambiguous" in the colloquial sense of the word, the term "ambiguity" in Texas contract law connotes a greater degree of linguistic indeterminacy than it does in common parlance. *See Universal CIT Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951). Before declaring a contract ambiguous, a court must seek to understand its objective meaning based on its plain language, but if text alone is inconclusive, the court may consider any extrinsic circumstances that shed light on the objective meaning conveyed by the text. *See Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998). It is to these extrinsic indicators of meaning that we now cautiously turn, bearing in mind that "[s]urrounding facts and circumstances can inform the meaning of [contractual] language but cannot be used to augment [or] alter" it. *URI*, 543 S.W.3d at 758.

Endeavor's primary non-textual argument is economic.[5] Endeavor contends that its construction of the contested sentence is preferable because it represents a more sensible bargain

---

[5] Another of Endeavor's non-textual arguments is that its interpretation of the contested sentence is supported by the course of the parties' performance. Under Energen's interpretation, the Lease would have terminated in 2011 either between the drilling of the second and third wells or between the third and fourth wells. The lessor, however, never sought termination of Endeavor's leasehold interest at that time. We do not consider this argument. Although we can take into account surrounding "facts and circumstances" as aids in construing unclear contractual language, the purpose of doing so is to discern the parties' "objective intent." *URI*, 543 S.W.3d at 768. We therefore "consult[] . . . only circumstantial evidence that is objective in nature." *Id*. By contrast, "the parol evidence rule prohibits extrinsic evidence of *subjective* intent." *Id*. at 767 (emphasis added). Such evidence includes a party's "acquiescence" to another party's actions, *Kachina Pipeline*, 471 S.W.3d at 453, and other "course-of-performance evidence" of the type Endeavor points to in this case, *see Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 206 (Tex. 2019). Evidence of subjective intent is "only relevant after the court has determined that the contract

between the parties' interests than does Energen's reading. Speculation about the parties' unstated purposes should never take the place of careful consideration of the text of the parties' stated agreement. But when text is not conclusive on its own, courts should "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served." *Reilly*, 727 S.W.2d at 530. In so doing, courts should not forget that parties "[a]re free to contract for . . . odd results." *Burlington*, 573 S.W.3d at 211. Endeavor theorizes that the primary benefit for which the lessor (Quinn) bargained was the completion of a new well, on average, every 150 days, whereas the lessee sought flexibility in its drilling schedule. Endeavor claims that its reading of the contested language best balances these presumptive objectives. In the long run, even if Endeavor banks unused days from multiple terms in order to later take long hiatuses from drilling, Endeavor will still average one well every 150 days. *See* Ronald D. Nickum, *Negotiating and Drafting a Modern Oil and Gas Lease on Behalf of Lessor*, 13 TEX. TECH L. REV. 1401, 1432 (1982) ("[I]f the lessee exceeds the requirements of continuous development by drilling more wells than is necessary within a stated period . . . , it is only fair that it be allowed to stack time periods to extend the time when it must . . . commence another well.").

Energen, however, has a different theory about the continuous-development clause's purpose, a theory with which the court of appeals agreed. *See* 563 S.W.3d at 456–57. Energen contends that continuous-development (or continuous-operations) clauses—which "have become ubiquitous" in oil and gas leases, 6 WEST'S TEX. FORMS, MINERALS, OIL & GAS § 3:2 n.28 (4th

is ambiguous," *E. Montgomery Cnty. Mun. Util. Dist. No. 1 v. Roman Forest Consol. Mun. Util. Dist.*, 620 S.W.2d 110, 112 (Tex. 1981), such that its meaning "must be resolved by a finder of fact," *Lenape*, 925 S.W.2d at 574. Here, however, although we ultimately conclude that the Lease is ambiguous, we resolve the case by resort to the rule that ambiguous contractual terms may not operate as special limitations, thus obviating the need to submit the issue of the parties' intent to a fact-finder.

ed.)—are typically intended to "permit[] a lease to be preserved under certain circumstances even though there is no production after the expiration of the primary term during *continuous* drilling operations." 3 PATRICK H. MARTIN & BRUCE M. KRAMER, WILLIAMS & MEYERS OIL AND GAS LAW § 617 (7th ed. 2018). According to Energen, the object of "these types of clauses" is to require that development efforts "'be continuous with no gap,'" and accordingly to stipulate that the lease will "terminate[] immediately and automatically . . . [i]f the efforts cease at any moment." *Discovery Operating*, 554 S.W.3d at 597 (quoting *Rogers v. Osborn*, 261 S.W.2d 311, 315 (Tex. 1953) (Wilson, J., concurring)). Energen posits that the lessor here was primarily interested not in ensuring a certain "average" duration in gaps between the drilling of wells (as Endeavor suggests), but rather in avoiding excessively long gaps.

Given the indeterminacy of the provision's text, however, we are reluctant to put dispositive weight on any objectives we might impute to these contracting parties. The parties themselves chose to highlight the disputed sentence in bold text, indicating their understanding of its singular importance as an exception to the general rule, stated previously in the Lease, that a new well must always be commenced within 150 days of completion of the preceding well. Both parties advance plausible understandings of the provision's commercial purpose, but without clearer textual instruction in the parties' agreement, resolving this case based on what we think the parties meant to accomplish would impermissibly rewrite their agreement. Neither side's arguments regarding the Lease's commercial purposes are sufficient to break the tie created by the Lease's ambiguous language.

Energen also observes that several secondary sources include examples of model continuous-development clauses that explicitly allow the lessee to "bank" unused days across

multiple terms.[6] Energen argues that unlike any of the model clauses allowing unlimited banking, this Lease, in explaining when unused days may be used, both refers to a future "term" in the singular form *and* uses the word "next." We have at times said that the parties' decision to use certain provisions from a form contract while altering or excising others is given "special weight in construing the instrument." *Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 472 (Tex. 2011). But we have never adopted Energen's argument that the mere existence in form books of standard language the parties *could have* used to express their agreement means the parties made a conscious decision to reject the agreement stated in the form books. Just as the parties could have used one of the standard form "banking" clauses to more clearly express their agreement to that effect, it is likewise true that if they intended to adopt Energen's understanding of the deal, this also could have been expressed much more clearly (for example, an explicit "no banking of unused days" provision). This case is before us after years of

---

[6] *See, e.g.*, 6 WEST'S TEX. FORMS, MINERALS, OIL & GAS § 3:85 (4th ed.) ("If fewer than one hundred eighty (180) days elapse between the completion of any well . . . and commencement of operations for the drilling of another well during such continuous drilling program, *the difference may be accumulated and added to the period within which any succeeding well must be commenced* in order for such program to remain in effect.") (emphasis added); 28A WEST'S LEGAL FORMS, SPECIALIZED FORMS § 22:25 ("In the continuous development program, *Lessee shall be entitled to accumulate and later use time saved between wells*") (emphasis added); Arthur J. Wright, *Sample Clauses*, 28 E. MIN. L. FOUND. § 14.06, 2007 WL 5471870 ("In the continuous development program, *Lessor shall be entitled to accumulate and later use time saved between wells* (that is, where the elapsed time between wells is less than . . . (180) days)") (emphasis added); Nickum, *supra*, at 1430–31 ("*intervals between wells may be stacked*; that is, Lessee shall earn a separate interval for each well drilled . . . *and may add these time periods together to arrive at a determination when it must again commence another well*") (emphasis added); Allen D. Cummings, *Continuing the Lease: Substitutes for Production and the Meaning of Continuous Operations*, 2018 NO. 3 RMMLF-INST 5, 5-6 ("*Lessee shall have the credit in time for such accelerated development* and . . . may subsequently . . . take advantage of such credit in time on a cumulative basis, and thus *extend the time for the commencement of the actual drilling of any subsequent well or wells* required to be drilled") (emphasis added); Owen L. Anderson, *David v. Goliath: Negotiating the "Lessor's 88" and Representing Lessors and Surface Owners in Oil and Gas Lease Plays*, 27 RMMLF-INST 2 n.270 (1982) ("Lessee shall be given credit for . . . time . . . not utilized because of drilling by Lessee sooner than required, and *such credit may be used to extend subsequent drilling intervals in such manner as Lessee may determine*; provided, however, that at no time may Lessee accumulate more than . . . (365) days credit.") (emphasis added).

litigation precisely because the parties did not carefully state their agreement in unmistakable terms. Certainly there were many ways the agreement could have been stated more clearly, but that observation gets us nowhere.

Ultimately, our "construction [of an oil and gas lease] must be" based predominantly on "the particular clause[] . . . at issue." 4 TEX. PRAC., LAND TITLES AND TITLE EXAMINATION § 23.66 (3d ed.). The parties point to no example, and we have found none, of the clause before us having been used before or since this Lease. We express no views on the meaning or purposes of continuous-development clauses not before us. The surrounding circumstances of this Lease, when considered in conjunction with the parties' chosen language, do not point to an objectively correct understanding of the disputed provision. Both sides' readings of the provision are reasonable.

### D. Enforceability as a Special Limitation

Having endeavored to determine the disputed provision's objective meaning, we conclude that it remains "reasonably susceptible to more than one meaning" and therefore "ambiguous." *Lenape*, 925 S.W.2d at 574. Energen seeks to enforce the continuous-development clause as a special limitation by securing a declaration that Endeavor's leasehold interests have terminated. Again, it has long been the rule that contractual language will not be held to automatically terminate the leasehold estate unless that "language . . . can be given no other reasonable construction than one which works such result." *Knight*, 188 S.W.2d at 566 (citing *Decker*, 216 S.W. 385). As explained above, the Lease's description of the drilling schedule required to avoid termination is ambiguous under these circumstances. Courts should not treat an obligation so "lacking in definiteness and certainty as introducing" into a lease a "limitation[] leading to . . .

17

termination of [a] vested estate[].” *W.T. Waggoner Estate*, 19 S.W.2d at 31. Because the disputed provision is ambiguous, it cannot operate as a special limitation under these circumstances.

### III. Conclusion

Because “[a]mbiguities [in continuous-development clauses] are frequent concerning the times at which wells must be commenced,” “[g]reat care should be exercised in drafting to avoid questions of whether the lessee has complied.” 6 WEST’S TEX. FORMS, MINERALS, OIL & GAS § 3:2 n.28 (4th ed.). Had greater care been taken in the drafting of this continuous-development clause, this litigation could have been avoided.

The judgment of the court of appeals is reversed, judgment is rendered for Endeavor on the question of title, and the case is remanded to the trial court for further proceedings consistent with this opinion.

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** December 18, 2020

18